[No. G044165. Fourth Dist., Div. Three. Feb. 9, 2011.]

In re B.T., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
DEBRA T., Defendant and Appellant.

COUNSEL

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

OPINION

**BEDSWORTH, J.—**

## INTRODUCTION

B.T., the child who is the subject of this appeal, was conceived during an unlawful sexual relationship between Debra T., an adult, and Miguel M., a minor. Debra was arrested for this relationship when B.T. was not yet five months old; Orange County Social Services Agency (SSA) thereupon detained not only B.T., but Debra's three other children, ages 17, 12, and nine, on the grounds of substantial risk to them of neglect and sexual abuse by Debra. After the subsequent hearing for B.T. in August 2010, the juvenile court found that it had jurisdiction over B.T., based on a risk to her of sexual abuse and neglect, and awarded Miguel full legal and physical custody, with monitored visits by Debra.[1] Debra appeals these rulings.

We reverse. After carefully examining the record, we cannot find substantial evidence to support the juvenile court's jurisdiction over B.T. at the time the findings and orders were made. There was no evidence that Debra was likely to abuse or neglect B.T. On the contrary, she had an exemplary track record of child rearing. While her relationship with Miguel certainly reflected poorly upon her judgment in one area, nothing suggested that it would cause her to neglect or abuse her baby daughter, especially since there was no evidence at all of any past abuse of her three other children, or of any other children.

---

[1] The other three children are not involved in this appeal. We refer to them, however, because Debra's relationship with them bears on jurisdiction over B.T.

Because we reverse the finding of jurisdiction, we need not decide the propriety of awarding full legal and physical custody to Miguel.

## FACTS

Debra was 38 years old and married to Jesse T. when she began a relationship with her neighbor's 14- or 15-year-old son, Miguel.[2] Miguel was friends with Debra's elder son, and the two extended families had been close for many years. Debra and Elsa, Miguel's mother, had known each other since they were children; their houses were two doors apart. Debra had known Miguel from his infancy. Debra's two younger children were also good friends with Miguel's family. Jesse's brother was Elsa's live-in boyfriend.

The origin of the relationship between Debra and Miguel was disputed. Miguel had two pretrial versions of what happened. He told the Santa Ana police officer who interviewed him on March 14, 2010 (the day his mother reported Debra to the police), that the relationship had begun approximately a year before, with Debra asking him to call her. He went to her house at her request one night, presumably sometime in March or April 2009, and they had sexual intercourse. Miguel told the police officer he and Debra had sex twice approximately every other weekend for about six months. He agreed with the officer, who consulted a calendar to count the weekends during that period, that he and Debra had had sex somewhere between 20 and 30 times. He asserted that the sex was consensual, and no drugs or alcohol was involved on either side. He stated Debra later told him she was pregnant, and he stopped having sex with her about a month before she gave birth. Although the officer asked Miguel to telephone Debra and talk about their sexual relations, Miguel declined. He did not want to talk to her, and he did not believe she would talk to him.

When a social worker interviewed Miguel on April 12, 2010, however, he told a somewhat different story. In this interview, he maintained that Debra had begun the relationship in early September 2008, while he was 14,[3] when Debra told him to call her. They communicated by phone and by letter. Finally, they had sexual intercourse late at night, in the living room of Debra's house while her family was asleep. (In this interview, Miguel did not

---

[2] It is not clear how old Miguel was when the relationship began. Miguel gave several accounts of its origin, with differing timeframes. He was, however, definitely underage.

[3] Miguel turned 15 in December of 2008.

specify a date or a time period when the sexual intercourse began.) Miguel stated he slipped out of his house at night and went to Debra's house, where he stayed for four or five hours before sneaking back into his own home. He reiterated that the sex was consensual, without any pressure from Debra, and said they had had sex about 30 times.

Debra's story was different altogether. She claimed Miguel was the instigator, and they had had sex only three times. She had been intoxicated the first time and had realized only afterward that Miguel had had sex with her. The other two times, according to Debra, occurred when Miguel came to her house when he knew she was alone. She claimed to have remonstrated with him on both occasions, but to no avail. She admitted she had not reported Miguel to the police. She also admitted she regularly drank beer at night.

Miguel and Debra's baby, B.T., was born prematurely (at 30 weeks) in late November 2009. B.T. went home with Debra, who took care of her, along with Debra's three other children. Miguel saw B.T. twice between November 2009 and April 2010. A DNA test, which Elsa arranged in early February 2010, established he was B.T.'s father. Elsa stated she had learned about B.T.'s paternity from Miguel while Debra was still pregnant with B.T.

On March 14, 2010, Elsa reported Debra to the police for molesting Miguel. Debra was arrested on March 23 and charged under Penal Code sections 266c (unlawful sexual intercourse) and 288, subdivision (b)(2) (caretaker lewd and lascivious acts). Debra was released on bail. Debra's husband, Jesse, who had separated from her in May 2009, moved back into the family home in order to help care for the children after her arrest.

SSA became involved and detained all four children under Welfare and Institutions Code section 300, subdivision (b) on April 12, 2010.[4] A petition was filed on April 14. SSA alleged the children's physical or emotional health was in substantial danger because of their mother's arrest and alcohol abuse, while Jesse was at fault for allowing Debra to live in the same house with the children after knowing about her alcohol abuse and misconduct with Miguel. An amended petition was filed on May 13, 2010, adding allegations under section 300 subdivision (d) that the children were at risk of being sexually abused by Debra.

Eventually the three older children were sent to live with Jesse's parents, where Jesse eventually was allowed to join them, while B.T. went to the

---

[4] All further statutory references are to the Welfare and Institutions Code.

Orangewood facility. B.T. was ultimately placed with Miguel and Elsa. Debra was allowed monitored visits with B.T. twice a week. The older children were included in some of these visits.

A hearing took place on August 17 and 18, 2010. Five SSA reports were admitted into evidence. Miguel testified; Debra did not. Miguel stated he was going into the 10th grade and had no source of income. He did not participate in B.T.'s prenatal care at all, was not present at the hospital when she was born, and first saw B.T. approximately two or three weeks after her birth. In the more than four months before B.T. came to live with Miguel and his mother, he saw her twice, and had made no effort to be involved with her upbringing during that time. As of the date of the hearing, he had never taken B.T. to the doctor and did not know the name of her pediatrician. His mother bought B.T.'s supplies, such as formula and diapers; he sometimes accompanied his mother on these shopping trips. He did not know the correct date of B.T.'s birth. B.T. was in daycare while Miguel was in school. He expected to be involved in afterschool sports—football and basketball—once school started up again at the end of August. Each of these sports had practice for two hours every day during their respective seasons. He could not exactly remember when B.T. came to live in his house; he thought it was either January or March 2010.[5] During the part of the school year when B.T. resided at his house, he fed her once a day. If she woke up during the night, his mother got up to care for her. He attended a parenting class twice, but did not learn anything from it. He was signed up for another parenting class at the time of the hearing. He had no plans for the future other than to take care of B.T.

Miguel's testimony about his relationship with Debra did not match either his statements to the police officer in March or the social worker in April. He could not remember when or how the relationship had become sexual until prompted by SSA's counsel. He gave new details about how the relationship started—Debra licked his neck and kissed him in his grandmother's pool.[6] SSA's counsel asked him how many times he and Debra had had sexual intercourse; Miguel did not know. Twenty times? Thirty times? Forty times? Miguel replied "probably more" and "probably," finally settling on 40 times. He did not know how long the sexual part of the relationship lasted— "probably more than six months." He reiterated that he slipped out of his

---

[5] B.T. was actually placed in his home on April 16, 2010.

[6] All of this testimony was elicited after much prompting by SSA's counsel. Miguel testified he could not remember when these events occurred in relation to each other, or even when they occurred at all, until counsel suggested dates and time intervals to him.

house late at night to have sex with Debra at her house; he stayed each time about four or five hours, sometimes on school nights. He testified he admitted to his mother that he was B.T.'s father shortly after her birth.

On August 19, 2010, the juvenile court awarded full legal and physical custody of B.T. to Miguel and permitted Debra monitored visitation twice a week for four hours each time. The court based its ruling in part on the lack of judgment and impulse control demonstrated by Debra's relationship with Miguel, which represented a "danger to [B.T.]" The court also found that Debra abused alcohol, leading to lapses in judgment.

## DISCUSSION

Debra challenges the sufficiency of the evidence to support the juvenile court's jurisdiction. In reviewing the sufficiency of the evidence, we consider the entire record to determine whether substantial evidence supports the court's findings. We draw all reasonable inferences in support of these findings. Inference, however, must be reasonable and logical; "inferences that are the result of mere speculation or conjecture cannot support a finding [citations]." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 [29 Cal.Rptr.2d 191].)

Substantial evidence does not mean *any* evidence; it must be " ' "substantial" proof of the essentials which the law requires.' " (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100 [109 Cal.Rptr.2d 583], quoting *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) "To be sufficient to sustain a juvenile dependency petition the evidence must be ' "reasonable, credible, and of solid value" ' such that the court reasonably could find the child to be a dependent of the court by clear and convincing evidence." (*In re R.M.* (2009) 175 Cal.App.4th 986, 988 [96 Cal.Rptr.3d 655].) A mere "scintilla" of evidence is not enough. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393 [32 Cal.Rptr.3d 526].)

The juvenile court assumed jurisdiction over B.T. (as well as the other three children) pursuant to section 300, which provides in pertinent part:

"Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶]

"(b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of

his or her parent or guardian to adequately supervise or protect the child . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse. . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness. [¶] . . . [¶]

"(d) The child has been sexually abused, or there is a substantial risk that the child will be sexually abused . . . by his or her parent or guardian . . . , or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."

■ The three elements for jurisdiction under section 300, subdivision (b) are: " '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.' " (*In re Savannah M., supra*, 131 Cal.App.4th at p. 1396, quoting *In re Rocco M.* (1991) 1 Cal.App.4th 814, 820 [2 Cal.Rptr.2d 429].) "The third element, however, effectively requires a showing that *at the time of the jurisdictional hearing* the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur)." (*In re Savannah M., supra*, 131 Cal.App.4th at p. 1396, italics added; see also *In re S. O.* (2002) 103 Cal.App.4th 453, 461 [126 Cal.Rptr.2d 554] [past conduct probative "if there is reason to believe that the conduct will continue"].)

■ The paramount concern of any dependency proceeding is the child's best interests. (*In re Josiah Z.* (2005) 36 Cal.4th 664, 673 [31 Cal.Rptr.3d 472, 115 P.3d 1133].) Given the record in this case, we feel it necessary to state the obvious: *B.T.'s* best interests are at issue here. Everything else has to take a backseat.

I. *Serious Physical Harm or Illness from Inadequate Supervision or Protection (§ 300, Subd. (b))*

There is no evidence in the record that B.T. had suffered any serious physical harm or illness—or any harm or illness at all—while she was in Debra's care after her birth. B.T. was in fine shape when the social worker visited Debra's home on April 12, 2010, even though she was seven weeks

premature. Debra's family had had no encounters with SSA before B.T. and the other children were detained. The record of Debra's visits with B.T. after she was detained confirmed that Debra is a loving and experienced mother, well able to take proper care of a small child.[7] There was no basis in August 2010 for the court's jurisdiction based on past abuse or neglect of B.T.

Instead jurisdiction was based on substantial risk of future physical harm or illness from inadequate protection because of Debra's actions with Miguel and her arrest. As of the time of the hearing, however, Debra was out on bail. The criminal charges against her were still pending. She had no prior criminal record. SSA's assertion that the arrest placed B.T. at risk of future neglect was at that point purely speculative. In addition, Debra's actions with Miguel did not involve serious physical harm.

The lack of focus on B.T. is evident in the court's remarks on Debra's lapses of judgment as a basis for its ruling. The court stated Debra's actions with Miguel demonstrated "lapses in judgment and impulse control," representing "[a] danger to [B.T.]" But B.T. was not yet born, in fact, did not even exist, when Debra began having lapses of judgment and impulse control with Miguel, regardless of whose story reflects reality. For these lapses to endanger *B.T.*, there had at a minimum to be some evidence that Debra either habitually had them in the past and so was very likely to have them in the future or was likely to have them in the future for some other reason. There was no such evidence. Moreover, these lapses had to threaten serious harm to *B.T.*, not Miguel or someone else. There was no evidence of that either.

## II. *Inability to Provide Care Due to Substance Abuse (§ 300, Subd. (b))*

■ Whether Debra had a problem with alcohol was relevant in this context only to the extent that it affected her ability to take care of B.T. *In re James R.* (2009) 176 Cal.App.4th 129 [97 Cal.Rptr.3d 310], is instructive here. In that case, there was evidence that the mother drank beer, but no evidence that the beer drinking rendered her incapable of taking care of her children or posed a risk to them. "The mere possibility of alcohol abuse, coupled with the absence of causation, is insufficient to support a finding the minors are at risk of harm within the meaning of section 300, subdivision (b)." (*In re James R., supra*, 176 Cal.App.4th at p. 137; see also *In re R.M.* (2009) 175 Cal.App.4th 986, 990 [96 Cal.Rptr.3d 655] [mother's

---

[7] What was best for B.T. had vanished so far over the horizon by the time of the disposition hearing that Miguel's counsel argued in favor of Debra's having *no* visitation with B.T. at all, despite the uniform reports of how well the visits had been going.

acknowledged depression and physical disabilities did not interfere with her ability to care for children].)

Here the evidence showed that Debra regularly drank beer, and various people opined that she drank more beer than they believed she should have. No one, however, opined that she neglected or endangered B.T.—or her other children for that matter—as a result. In fact, those family members who were asked about beer's effect on Debra's behavior stated it had no effect. Debra had never been arrested for drunk driving or for any alcohol-related offense. SSA speculated that Debra must have been drunk when she was having sex with Miguel; Miguel himself denied this.[8] There was no evidence that Debra's beer consumption placed B.T. at risk of serious physical harm. Moreover, between May 22 and July 9, Debra tested clean 11 times at frequent intervals, an unlikely feat for someone in the grip of a serious addiction.[9] Two other tests at the end of July were also negative.

III. *Sexual Abuse or Risk of Sexual Abuse (§ 300, Subd. (d))*

This record contains no evidence that Debra or anyone else ever sexually abused B.T. SSA, however, alleged that Debra's former relationship with Miguel placed B.T. at risk for sexual abuse.

SSA's position assumes an adult woman who has had a consensual sexual relationship with an unrelated 15-year-old boy will probably sexually abuse her infant daughter.[10] This is, of course, a complete non sequitur, so it is not surprising that the record contains no evidence to support this assumption. There was, for example, no expert testimony to this effect. (Cf. *In re Maria R.* (2010) 185 Cal.App.4th 48, 68 [109 Cal.Rptr.3d 882] [no scientific authority or empirical evidence cited to support conclusion that man who sexually abuses female child is likely to abuse male child].) If Debra were given to sexually abusing her children, she had three handy before B.T. was born, including two boys. All three older children denied ever being abused, sexually or otherwise; no evidence contradicted their denials or even called them into question. SSA presented no evidence of Debra's being accused of

---

[8] According to Debra, she was too drunk to know what was happening when Miguel had sex with her the first time. There was no evidence, however, that this level of intoxication was habitual with Debra. (Cf. *In re J.N.* (2010) 181 Cal.App.4th 1010 [104 Cal.Rptr.3d 478] [single drunk-driving incident not sufficient to support jurisdiction based on substance abuse].)

[9] Debra tested 12 times in total during this period; one test came back "diluted."

[10] We disregard SSA's speculation on appeal that Debra would permit someone else to molest B.T. This notion was not alleged either in the original petition or in the first amended petition.

molesting another child in the past.[11] The record is devoid of evidence of a risk to B.T. of being molested by Debra.

If Miguel's stories are credited, he was by his own admission a more-than-willing participant in the relationship, which is not surprising with an adolescent boy.[12] Generally speaking, abused children do not repeatedly volunteer to put themselves in harm's way. This presents a situation far different from the one SSA proposed. It also presents a situation far different from the facts of the cases cited in SSA's brief to support its theory of threatened sexual abuse, all of which involved adults in some sort of parental role forcing themselves on unwilling and helpless children residing in their homes. (*In re Andy G.* (2010) 183 Cal.App.4th 1405 [107 Cal.Rptr.3d 923] [parent living in home molested child's half siblings, also living in home]; *In re P.A.* (2006) 144 Cal.App.4th 1339 [51 Cal.Rptr.3d 448] [male siblings of molested nine-year-old girl at risk as they approach age of molested child]; *In re Karen R.* (2001) 95 Cal.App.4th 84 [115 Cal.Rptr.2d 18] [father living in home raped daughter; siblings also living in home detained]; *In re Katrina W.* (1994) 31 Cal.App.4th 441 [37 Cal.Rptr.2d 7] [father living in home molested daughter; sibling detained]; *In re Jason L.* (1990) 222 Cal.App.3d 1206 [272 Cal.Rptr. 316] [son removed from father's home after father molested daughter]; but see *In re Maria R., supra*, 185 Cal.App.4th at pp. 65–68.)

We do not wish to be understood as excusing Debra's behavior or minimizing its gravity. In addition to being potentially a serious criminal offense, it was a many-faceted betrayal of people who had every right to trust her—her husband, her children, Elsa, and Miguel, to name the most obvious ones. The Penal Code statutes, designed to punish and deter, are in place to deal with her conduct.[13]

Juvenile dependency proceedings, however, have a different focus: protecting children and serving their best interests, not punishing the parent. (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233 [91 Cal.Rptr.3d 140, 203 P.3d 454]; see also *Katheryn S. v. Superior Court* (2000) 82 Cal.App.4th 958, 974 [98 Cal.Rptr.2d 741].) Nothing supports the idea B.T. was at any risk of harm from Debra. Whatever her faults were with regard to Miguel, Debra has taken

---

[11] Physical abuse of an unrelated child was considered substantial evidence supporting jurisdiction under section 300, subdivision (b) in *In re Y.G.* (2009) 175 Cal.App.4th 109 [95 Cal.Rptr.3d 532]. In that case, however, the two children were the same age (two years old) and sex. (*Id.* at p. 114.) And the mother had engaged in physical, not sexual, abuse.

[12] As Jesse put it, "I know that 15 year old boys are full of hormones."

[13] We should also point out again that when SSA detained the children and at the time of the hearing, Debra had not been convicted of anything.

good care of her children. Her three older children, at least as far as this record reveals, do her and her husband great credit. No evidence presented at the time of the hearing suggested that B.T. would receive anything but the same upbringing and attention from Debra. On the contrary, the evidence showed that before SSA intervened, B.T. was thriving in her care.

The effort to punish Debra at B.T.'s expense is perhaps best illustrated in a statement made by B.T.'s appointed counsel, with which Miguel's counsel joined, during closing argument at the hearing. B.T.'s counsel insisted that Miguel should have sole legal custody of B.T. in part because it would "allow [Miguel] to make decisions on behalf of [B.T.] with respect to medical issues, things like that. To give the parents both joint legal custody would basically be giving [Debra] an advantage because she is an adult, and I believe that as such, medical professionals would be listening more to her opinions on how [B.T.], whatever medical attention [B.T.] should get, where, in fact, [B.T.] is residing with [Miguel], and even though he is a minor, he is entitled to make decisions because he is a parent in this case." Miguel's counsel seconded the motion. Medical professionals caring for B.T. quite probably would listen more to the mother of three healthy children than to a 16-year-old boy without prior parental experience who believes—as Miguel testified—that a body temperature above 93 indicates fever and who would treat a fever by putting the baby down to rest. Would anyone focused on *B.T.'s* best interests oppose such a preference?

IV. *Failure to Protect (§ 300, Subd. (b))*

The final allegation of the amended petition concerned Jesse's failure to protect the children by allowing Debra to live in the house with them after learning of her relationship with Miguel. Jesse was evidently expected to expel Debra, who was taking care of a prematurely born infant as well as the three older children, in order to safeguard these same children.

As the discussion above indicates, Jesse had no reason to protect B.T., or the other children, from Debra. She posed no danger to them. There was no evidence that her attitude or behavior toward any of them changed after her affair with Miguel came to light or that her beer consumption began to affect her ability to care for them. She was, from what the record reveals, the same mother she had always been toward all of her children, including B.T.

Given the nature of the accusations against Debra, checking her home was well within SSA's responsibility to make sure that "the kids are all right."

This vigilance accords with the dependency statutes' chief purpose: "[t]o protect the child." (*In re Santos Y.* (2001) 92 Cal.App.4th 1274, 1317 [112 Cal.Rptr.2d 692].) The dependency statutes have another purpose, however, one running a close second to protecting children: "to preserve the family." (*Ibid.*) SSA appears to have lost sight of this purpose early on.

In fact, the kids were all right. The three older children were well cared for and displayed every indication of having had a secure family life. They gave no hint of feeling any need to be protected from their mother. Their father, who was understandably angry at both Debra and Miguel, had nevertheless rallied round to protect the children in this crisis.[14] The baby was doing fine. The most searching interviews and home inspections revealed no evidence of any kind of child abuse or neglect, any domestic violence, any drugs, any previous trouble with the law or with social services. SSA, however, became so busy demonizing Debra that it abandoned its role as protector of children and preserver of families. SSA took all four children away, exacerbating the existing family turmoil. The older children were sent to live with their paternal grandparents, who speak no English. (The older children speak no Spanish.) The baby, not yet five months old, went to a county facility, then to Elsa and Miguel's home.[15]

The record reveals the older children's unwavering desire to be with their mother and their wholehearted reception of B.T. as their little sister. Showing remarkable magnanimity, Jesse accepted B.T. in his home, allowing his children to live with their half sister. Splitting up this family, and taking B.T. away from her mother and the three older children during her infancy, could be justified only by substantial evidence of a serious risk to *B.T.* of neglect or sexual abuse. There was no such evidence.

■ Debra made a grave mistake, regardless of whether she or Miguel is telling the truth about their relationship. But depriving B.T. of her mother's care as punishment for this mistake is not in keeping with the purpose of the dependency statutes and is inexplicable in any terms other than misplaced moral outrage.

Because we find that no substantial evidence supported the juvenile court's jurisdiction over B.T. at the time of the hearing, we need not decide whether custody was appropriately awarded to Miguel.

---

[14] SSA categorized this demonstration of family solidarity as "co-dependen[cy]." We cannot pretend we are not shocked by this mischaracterization.

[15] One has to wonder about B.T.'s safety in a home from which Miguel claimed to have been able to sneak out and back in late at night somewhere between 20 and 40 times during a six-month period without his absence being noted.

## DISPOSITION

The orders are reversed and the matters are remanded with directions that the court vacate those orders and issue new orders (1) finding that B.T. is not a dependent child within its jurisdiction under section 300; (2) dismissing SSA's section 300 petition as to B.T.; and (3) ordering B.T. discharged from any detention or placement therefore ordered.

Rylaarsdam, Acting P. J., and O'Leary, J., concurred.

On March 11, 2011, the opinion was modified to read as printed above.