Filed 9/3/14  In re Brandi M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re BRANDI M., a Person Coming Under the Juvenile Court Law. | B250427 (Los Angeles County Super. Ct. No. CK98923) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ERICA H., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Tony Richardson, Judge.  Reversed in part, affirmed in part and remanded with directions.

William Hook, under appointment by the Court of Appeal for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and John C. Savittieri, Deputy County Counsel for Plaintiff and Respondent.

No appearance for Minor.

_____

Erica H. (Mother) appeals from the juvenile court's jurisdiction order sustaining a dependency petition pursuant to Welfare and Institutions Code section 300, subdivision (b),[1] and a disposition order declaring her daughter Brandi M. (Brandi) a dependent of the court, removing Brandi from her custody, requiring Mother to participate in reunification services and permitting her monitored visitation.

We affirm in part, reverse in part and remand the matter with directions. Substantial evidence supported jurisdiction on the grounds Mother's setting a fire in her apartment and her mental and emotional condition posed a substantial risk of harm to Brandi. There was insufficient evidence, however, that Mother was currently abusing drugs or alcohol, or that her alcohol or drug use posed a risk to Brandi. Substantial evidence likewise supported the disposition order removing Brandi from Mother's custody. The juvenile court properly exercised its discretion to require Mother to participate in family reunification services designed to alleviate the risks to Brandi. In view of our reversal of the jurisdiction findings, those services should not have included drug and alcohol counseling with random testing. Finally, we conclude that ordering monitored visitation did not exceed the scope of the juvenile court's discretion.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Events Leading to Detention.*

Mother and her daughter Brandi, then 21 months old, came to the attention of the County of Los Angeles Department of Children and Family Services (Department) on April 5, 2013, after Mother had been arrested for arson and child endangerment. The referral stated there had been in the bathroom of Mother's apartment a fire that was put out by sprinklers. The referral added that when Mother left the apartment to get help, she kept Brandi in another room of the apartment while the fire was still in progress. Mother was seen outside of the apartment without Brandi. The referral further stated that Mother is "'spun out or possibl[y] suffers from mental illnesses.'" Following an investigation of

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

the scene and an interview with Mother, law enforcement concluded that Mother had set the fire.

A Department social worker interviewed Mother in jail. Mother became hysterical when the social worker arrived, and was crying and screaming out of control. Throughout the interview, Mother continued to cry and repeated herself, stating she loved her daughter and asking the social worker to pray with her. The social worker explained to Mother why she was arrested when Mother stated she did not understand why she was in jail. Regarding the fire, Mother explained she had been sitting on the toilet trying to light a "torch light"; she kept flicking the switch but it would not light. After she left the bathroom she heard a "pop" and then walked by the bathroom and saw the fire. She said the fire started accidentally, adding there was an electrical problem in the building and that Brandi plays with matches. Mother then said she ran outside "to see what was happening," but did not take Brandi with her because she was naked. After she got Brandi dressed, she then took her outside the apartment.

A Long Beach Police Department (LBPD) report confirmed that the fire began in the bathroom, where some bath towels and a child's blanket caught fire. There were no signs of an electrical malfunction, and investigators rejected the possibility of Brandi having started the fire due to her age and size. In the bathroom, the arson investigator observed multiple prescription bottles bearing Mother's name and in her bedroom, saw a half-empty bottle of vodka and some cigarettes. An investigator saw Mother without her daughter outside the building. Mother did not make sense when the arson investigator interviewed her, but she admitted she had not taken her medications. She was crying and had difficulty staying on topic; investigators opined she appeared to be under the influence of an unknown substance. After an investigator discovered that Mother had left Brandi in the apartment while the fire was in progress, he arrested her and took Brandi into custody. When the social worker saw Brandi, she was quiet and calm, and would point to things she wanted. Except for lacking shoes, she was dressed appropriately.

Mother told the social worker that following a physical altercation with another woman approximately six months ago, she had been diagnosed with depression and

3

bipolar disorder and had been prescribed Ritalin, Prozac and an antibiotic. She continued to speak regularly with a psychiatrist whose contact information she provided, but stated she inconsistently took her medications and spoke with her therapist. She admitted to taking her medications with vodka and admitted to smoking marijuana because she liked it.

Mother identified Brandi's father as Alberto M. (Father), stating she kicked him out three weeks earlier because he was not working or helping her, and they were fighting. Father contacted the social worker the following day; he generally concurred with Mother's description of the reason for the separation. He was unaware of Mother having any mental illness, but believed she had an upcoming appointment for an assessment. He also denied that he or Mother used drugs. Even though the two had arranged for Brandi to stay with Father for certain periods of time, he stated that Mother had been erratic the last time he came to pick up Brandi and would not let her go. He did not have any concerns about leaving Brandi with Mother, stating she took good care of his daughter.

The social worker assessed Father's home for Brandi's placement and interviewed Deborah E. (Deborah), his roommate's mother who was also living in the home. Deborah had known Mother for two years and had seen her several times recently when she came to the home looking for Father. She said that each time Mother had come over, she had been erratic and asked Deborah to pray with her. Deborah suggested Mother see a doctor. The social worker also interviewed the maternal grandfather, who stated that while he loves Mother, he believed Brandi would be better off living with Father. He characterized Mother as a "brat," and criticized her marijuana use. The Department released Brandi to Father while Mother remained incarcerated.

After she was arrested, Mother spoke with law enforcement; she was still upset and had trouble focusing. She said she had been cleaning and organizing her bathroom, adding that she typically did not smoke in her bathroom. She described how she would smoke on her patio and use a torch lighter to light her cigarettes. She then admitted bringing the torch lighter into the bathroom with her and "'tripping out' on the lighter."

4

Though she acknowledged that the torch lighter could have lit the towels, she then backed away from that statement and said she did not know how the fire started. Mother became emotional about her personal situation, including working, caring for Brandi and coping with life. She said she suffers from depression and takes Ritalin, Ativan and several other pills, but admitted she had not been taking the prescribed dosages and may have been mixing medications. She said she drank vodka the day before—but not the day of the fire.

On the basis of its investigation, the LBPD opined: "It is reasonable to conclude while 'tripping out' as she described and holding the torch lighter, the lighter came in contact with the towels which started to burn. Based on [Mother's] physical [and] mental condition and that she admitted she had been consuming multiple medications, she most likely did not know or conclude the towels were on fire or perceive the danger of her actions. Once she left the room, the fire grew in size and activated the sprinkler system."

On April 10, 2013, the Department filed a section 300 petition, alleging Mother placed Brandi in a detrimental and endangering condition by deliberately setting a fire in the home, and thereafter exiting the home and leaving Brandi without supervision (paragraph b-1); Mother had mental and emotional problems, including diagnoses of bipolar condition and depression, that rendered her incapable of providing regular care, and she failed to take her psychotropic medication as prescribed (paragraph b-2); and Mother had a history of substance abuse and was a current abuser of methamphetamine, marijuana and alcohol, and such abuse occurred in front of Brandi and rendered Mother incapable of providing regular care and supervision (paragraph b-3).

Father appeared at the hearing the same day, and the juvenile court found a prima facie case for detaining Brandi and ordered that she remain with Father. Approximately two weeks later, Mother appeared for arraignment.

***Jurisdiction and Disposition.***

The Department interviewed Mother and Father for its June 5, 2013 jurisdiction/disposition report. This time, Mother stated she lit her cigarette with the torch lighter and caught something on fire in the bathroom, though she did not see the

5

beginning of the fire. She said she was going to try to kick out the fire herself, but instead grabbed Brandi, wrapped her in a blanket and ran outside. She denied leaving Brandi alone in the apartment while the fire was in progress. Mother stated she had never been diagnosed with bipolar disorder but admitted to being depressed recently. She added she had taken Prozac in the past but stopped when she could not afford it. She admitted to using methamphetamine and marijuana in the past. Currently, she would only smoke marijuana from time to time. Though she admitted to drinking vodka the day before the fire, she denied using drugs or drinking alcohol on the day of the fire. She agreed to comply with all Department orders to have her daughter returned to her. Mother had enrolled in parenting classes, one-on-one counseling and alcohol and drug classes. Her two random drug tests were both negative.

Father stated he had very little information about the fire. A friend of Mother's told him Mother said she went outside after the sprinklers went off, but left Brandi inside because she did not have any clothes on. He was unaware of Mother having mental health issues or taking prescribed medication. He knew that Mother drank alcohol but had never seen her use drugs or be under the influence of drugs. Even though he was nonoffending, he agreed to comply with Department orders in order to maintain Brandi in his care.

Brandi was found to be in good health and developmentally appropriate for her age. Her monitored visits with Mother went well; Mother was appropriate and attentive to Brandi's needs.

The Department recommended that the section 300 petition be sustained, that Brandi remain placed with Father and that Mother receive reunification services for a period of time not to exceed six months. At the June 2013 jurisdiction hearing, the juvenile court received into evidence the Department's prior reports and a subpoenaed document from the LBPD regarding its investigation of the fire, which included several individual reports. In addition to the report that was attached to the Department's detention report, the LBPD document contained a separate report from Officer Canedo who was also present at the scene. He first saw Mother outside the apartment holding

6

Brandi. He observed that Mother was wet and had smudged ashes on her face and paint in her hair. Brandi was wet, wrapped up in a towel, and crying. Mother was erratic and said "see, there's no fire." He then accompanied Mother back inside the apartment because she wanted to get Brandi dressed. After the two went into a bedroom, he could hear Mother yelling at Brandi and, according to his report, he "later watched as she called her daughter a brat and locked her in a different room." After he accessed the room, he and a firefighter picked Brandi up and took her into protective custody.

Officer Canedo then asked Mother to explain her behavior, and she responded that she felt overwhelmed and thought she was going to hit Brandi, but a doctor had told her it was better to leave Brandi in her room in a "time out" instead of hitting her. When Officer Canedo explained he believed it was inappropriate to lock a young child in a flooded, smoke-filled apartment that had just been on fire, Mother responded that she had been having a hard time getting by without Father. Throughout his interaction with Mother, Officer Canedo detected that she was exhibiting signs and symptoms consistent with being under the influence of a central nervous system stimulant. Being familiar with the effect of such medications on individuals with mental health issues, Officer Canedo asked Mother if she suffered from any mental disorders, and Mother responded that she was bipolar. At that point, Officer Canedo characterized Mother's behavior as being consistent with a manic episode stemming from her bipolar disorder. Mother also responded affirmatively to Officer Canedo's question whether she had been drinking vodka with her medications. When he asked Mother about the paint in her hair, she said she had been painting her bedroom window "to stop the light from going in." Another report in the LBPD document contained a brief interview with the apartment building owner, who stated he had received complaints about yelling and fighting in Mother's apartment.

The Department called Mother as a witness. She testified that the fire started when she tried to light a cigarette with a torch, which in turn lit a towel on fire. She was not a heavy smoker and would typically light her cigarettes on the stove. After she left the bathroom to go dress Brandi, she heard a boom and saw smoke and sprinklers going

7

off in the bathroom. She wrapped Brandi in a blanket and went to the manager to ask him to call the police. She denied leaving Brandi alone in the apartment while the fire was in progress. Mother admitted she initially told law enforcement she did not know how the fire started and described how she thought it was possible Brandi's playing with a match could have started the fire. She conceded that she started the fire.

She confirmed that she accurately told the social worker she had not taken any illegal drugs the day of the fire, but added she had taken Prozac. She had not used methamphetamine for approximately 10 years, having completed a drug program at age 17. She estimated she smoked marijuana approximately two times per year, though never in front of Brandi. Since Brandi was detained, Mother had six clean drug tests. With respect to alcohol, Mother stated she drank approximately two drinks every other day before going to work, to make her feel more confident in her job as a dancer. She stated she has been taking Prozac for approximately four years, as prescribed through a clinic for depression. Mother's only diagnosis had been depression; a psychologist performed an initial evaluation for bipolar disorder, but Mother went to jail before she could go to the follow-up appointment. Her doctor was unaware she was taking the Prozac at the same time she was drinking vodka. Without consulting a doctor, Mother stopped taking Prozac once Brandi was detained. Her doctor had previously explained the risks of stopping her medication, including panic attacks. Mother admitted suffering one panic attack since going off Prozac.

Mother recalled the incident described by Officer Canedo when she returned to the apartment to dress Brandi. She tried to change her so they could go stay at a friend's house, but Brandi was screaming, crying and mad, and did not want to put her clothes on. Mother decided to give her a time out instead of hitting her. Mother stated she had never hit Brandi, but admitted to calling her a "brat," explaining, "I mean she's my brat. She was acting up." She did not consider "brat" to be a derogatory term.

Following counsels' arguments, the juvenile court sustained paragraph b-1, amending it to provide that Mother "placed the child in a detrimental and endangering situation in that the mother set a fire in the child's home," and eliminating references to

8

Mother "deliberately" setting the fire and leaving Brandi in the burning home without supervision. It sustained paragraph b-2 as pled and sustained b-3, amending it to eliminate any reference to methamphetamine.

Without further argument or evidence, the juvenile court proceeded to disposition, ordering that Brandi be removed from Mother's custody and placed with Father under Department supervision. The juvenile court further ordered that Mother participate in and complete a drug treatment program with random drug testing and after care; attend parenting classes; participate in individual counseling to address case issues; follow all recommendations made by her therapist; and take all prescribed medications as directed. It further ordered that Mother and Father participate in the PACT program, which focused on coparenting. With respect to visitation, the juvenile court ordered that Mother have monitored visitation, no less than three days per week for three hours at a time, with the Department having discretion to liberalize the visits and to allow Father to be the monitor. Upon further request by the Department, the juvenile court also ordered that Mother undergo a psychiatric evaluation.

Mother appealed.

## DISCUSSION

Mother challenges the juvenile court's jurisdiction and disposition findings on several grounds. She argues substantial evidence did not support jurisdiction under any of the three bases alleged; substantial evidence did not support the removal of Brandi from her custody; and the juvenile court abused its discretion by ordering inappropriate and unnecessary reunification services, and monitored visitation. We agree with Mother in part, as there was insufficient evidence to show she abused drugs or alcohol, and consequently, there was no basis for the juvenile court to require Mother to participate in drug and alcohol counseling and testing as part of her case plan. In all other respects, Mother's arguments provide no basis for reversal.

## I.     Standards of Review.

We review the juvenile court's jurisdictional findings under the substantial evidence test. (*In re B.T.* (2011) 193 Cal.App.4th 685, 691; *In re David M.* (2005) 134

9

Cal.App.4th 822, 828.) We also review a disposition order removing a child from parental custody for substantial evidence. (*In re D.G.* (2012) 208 Cal.App.4th 1562, 1574; *Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1078; see *In re Mark L.* (2001) 94 Cal.App.4th 573, 580–581 [although trial court makes findings by the elevated standard of clear and convincing evidence at disposition, substantial evidence test remains the standard of review on appeal].) In determining whether there is substantial evidence, ""'"we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We will uphold the juvenile court's finding if it is supported by substantial evidence, even if there is substantial evidence to support a contrary finding. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 230; accord, *In re Stephen W.* (1990) 221 Cal.App.3d 629, 644, fn. 12.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order. [Citation.]" (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1162.)

In connection with Mother's challenge to the scope of reunification services ordered, "[t]he court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion. [Citations.] We cannot reverse the court's determination in this regard absent a clear abuse of discretion. [Citation.]" (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006; but compare, *In re Jasmin C.* (2003) 106 Cal.App.4th 177, 180 [reviewing challenges to reunification services order for substantial evidence].) Similarly, we review a juvenile court's visitation order for an abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re S.H.* (2011) 197 Cal.App.4th 1542, 1557–1558.)

## II. Substantial Evidence Supported the Juvenile Court's Jurisdiction Findings Under Paragraphs b-1 and b-2, But Not Under Paragraph b-3.

The Department bears the burden of proving by a preponderance of evidence the juvenile court has jurisdiction. (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.)

10

Section 300, subdivision (b), permits the juvenile court to adjudge a child a dependent of the juvenile court where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." A true finding under subdivision (b) requires proof of: "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) "The third element . . . effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future." (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.)

In its section 300 petition, the Department alleged Mother's failure to protect Brandi caused her to suffer, or a risk she would suffer, serious physical harm or illness within the meaning of subdivision (b) for three separate reasons. "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) In other words, "'the juvenile court's jurisdiction may rest on a single ground.' [Citation.]" (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 83.) Nonetheless, we may exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings (*In re D.C.* (2011) 195 Cal.App.4th 1010, 1015); or (2) "could have other consequences for [the appellant], beyond jurisdiction" (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1493 [not reaching the merits of an appeal where an alleged father "has not suggested a single specific legal or practical consequence from this finding, either within or outside the dependency proceedings"] ). Because each basis alleged for jurisdiction here triggered individualized disposition orders, we will review each ground separately.

### A.     *Paragraph b-1.*

In paragraph b-1, the Department alleged Brandi was at risk from Mother's setting a fire in their apartment.[2]  The evidence showed that Mother had isolated herself in the bathroom in order to light her cigarette with a torch lighter and smoke it, while 21-month-old Brandi had unfettered access to the rest of the apartment.  On the basis of Mother's description of the events preceding the fire, as well as her condition after the fire, the LBPD investigators concluded that Mother was unaware she had lit the towels on fire and failed to perceive the danger of her actions.  Indeed, investigators concluded that she must have been in the bathroom when the fire started, and that it grew in size once she left.  The evidence further showed that once the fire was put out and Mother returned to the apartment to get Brandi dressed, she locked Brandi in her bedroom of the still smoky apartment because she was screaming and crying, and refusing to put on her clothes.  Again, Mother did not perceive any danger from her actions.  Instead, Mother initially denied awareness of the fire and tried to blame the fire on electrical problems or Brandi's playing with matches.

Exercise of dependency court jurisdiction under section 300, subdivision (b), is proper when a child is "of such tender years that the absence of adequate supervision and care poses an inherent risk to [his or her] health and safety." (*In re Rocco M., supra,* 1 Cal.App.4th at p. 824.)  There was substantial evidence that Mother's behavior in causing and reacting to the fire posed a substantial risk of harm to Brandi.  Though Mother emphasizes the evidence showing she was able to get Brandi out of the apartment safely once the fire had started, she ignores the balance of the evidence showing her failure to perceive the potential danger to Brandi from her actions both triggering and following the

---

**2**     By not challenging the language of the petition below, Mother has waived any appellate claim that the allegations of paragraph b-1 were insufficient to bring Brandi within the juvenile court's jurisdiction under section 300, subdivision (b). (*In re S.O.* (2002) 103 Cal.App.4th 453, 459–460; *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1038, fn. 8.)  "[A]fter a hearing on the merits has been held on the petition, the focus must necessarily be on the substance of the allegations found true by the juvenile court, not idiosyncratic particulars of the social worker's precise language." (*In re Jessica C., supra,* at pp. 1037–1038.)

fire. In reviewing a juvenile court's jurisdictional findings, "[w]e do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.) The pertinent inquiry is whether substantial evidence supports the finding, not whether a contrary finding might have been made. (*In re Dakota H., supra,* 132 Cal.App.4th at p. 228.) We conclude substantial evidence supported the juvenile court's exercise of jurisdiction pursuant to paragraph b-1.

### B. *Paragraph b-2.*

Paragraph b-2 alleged that Brandi was at risk as a result of Mother's mental and emotional problems, "including a diagnosis of Bi-Polar Disorder and Depression, which renders the mother incapable of providing the child with regular care and supervision." The Department further alleged that Mother had failed to take her psychotropic medication as prescribed. Though the evidence conflicted, substantial evidence supported jurisdiction on this basis. Mother stated she had been diagnosed with both bipolar disorder and depression; she described the multiple medications she had been prescribed and provided contact information for the prescribing psychiatrist. She admitted, however, that she took her medications inconsistently and on occasion mixed them, and, without consulting her own or any psychiatrist, stopped taking them completely after Brandi was detained.

Beyond Mother's statements, investigators who observed her opined that her behavior was consistent with a manic episode and that her mental condition contributed to her inability to recognize she had started a fire or perceive the danger of her actions. One investigator also noted that immediately before the fire Mother had been painting her bedroom window "to stop the light from going in." Father described how Mother screamed at him and became erratic when he tried to pick up Brandi for a prearranged visit. Father's roommate had also observed Mother's erratic behavior on multiple occasions. Likewise, the social worker characterized Mother as being out of control, crying, repeating herself and asking the worker to pray with her.

We recognize the Department "had the 'burden of showing specifically how [Brandi has] been or will be harmed and harm may not be presumed from the mere fact of mental illness of a parent.' [Citations.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 136.) Here, LBPD investigators opined that Mother's mental condition rendered her unable to recognize how she had started the fire and how her actions were likely to lead to a fire. This evidence showed more than a speculative risk of harm to Brandi from Mother's mental state. (Compare *In re David M., supra*, 134 Cal.App.4th at p. 830 [jurisdictional finding reversed because the record lacked "any evidence of a specific, defined risk of harm to [the children] resulting from mother's or father's mental illness"].) Moreover, contrary to Mother's assertion that there was no risk to Brandi because she was addressing these issues on her own, the evidence showed that prior to Brandi's detention she identified her diagnosis inconsistently, saw her therapist inconsistently and failed to take her medications in the manner prescribed by her psychiatrist. At the time of the jurisdiction hearing, substantial evidence showed that Mother's unresolved mental health issues posed a risk to Brandi.

### C. Paragraph b-3.

As the final basis for jurisdiction, the Department alleged that Mother "has a history of substance abuse and is a current abuser of methamphetamine, marijuana and alcohol, which renders the mother incapable of providing the child with regular care and supervision. On 04/04/201[3], and on prior occasions, in 2013, the mother was under the influence of illicit drugs and alcohol while the child was in the mother's care and supervision." The Department further alleged that Mother's abuse endangered Brandi and placed her at risk of harm.

In support of this allegation, the Department offered evidence that Mother used methamphetamine 10 years earlier and had not used it since going through a treatment program at that time; Mother admitted to smoking marijuana from time to time, approximately twice per year; Mother had a half-empty bottle of vodka in her bedroom, and she admitted to having two drinks the day before the fire and typically two drinks before going to work; and Mother admitted that she drank vodka within hours of

14

ingesting Prozac. Mother's father said that Mother had been using methamphetamine and marijuana, but Father had never observed Mother use drugs or be under the influence of drugs. A LBPD investigator who observed Mother at the scene of the fire opined her behavior was consistent with being under the influence of a central nervous system stimulant.

Evidence that a parent uses drugs or drinks alcohol is insufficient to support juvenile court jurisdiction. "It is undisputed that a parent's use of marijuana '*without more*,' does not bring a minor within the jurisdiction of the dependency court. [Citation.] The same is true with respect to the use of hard drugs. [Citations.] Instead, the [Department] had to present evidence of a specific, nonspeculative and substantial risk to [the child] of serious physical harm. [Citation.]" (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003; accord, *In re B.T., supra,* 193 Cal.App.4th at p. 693 ["Whether [the mother] had a problem with alcohol was relevant in this context only to the extent that it affected her ability to take care of [the child]"]; *In re James R., supra,* 176 Cal.App.4th at p. 137 ["The mere possibility of alcohol abuse, coupled with the absence of causation, is insufficient to support a finding the minors are at risk of harm within the meaning of section 300, subdivision (b)"]; *In re Jeanette S.* (1979) 94 Cal.App.3d 52, 59, fn. 2 [evidence of a parent's alcoholism, standing alone, is insufficient to support a dependency finding].) Thus, jurisdiction under section 300, subdivision (b), must be premised on a showing that a parent is a "substance *abuser*" and that such abuse poses a substantial risk to the child. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 764, 767.)

Here, the evidence was insufficient to show that Mother either abused drugs and alcohol or that her drug and alcohol use posed a risk to Brandi. As explained in *In re Drake M., supra*, 211 Cal.App.4th at page 764, a jurisdictional finding under section 300, subdivision (b) based on "the inability of the parent or guardian to provide regular care for the child due to the parent's . . . substance abuse" must necessarily include a finding that the parent is a substance abuser. Such abuse may be shown by evidence the parent was unable to fulfill a major role or obligations at work or home due to substance use; evidence of recurrent substance use in physically hazardous situations; evidence of

15

recurrent substance-related legal problems; or evidence of recurrent substance use despite it causing or exacerbating social or interpersonal problems. (*In re Drake M., supra,* at p. 766.)

Here, there was no substantial evidence that Mother was a current abuser of marijuana. The Department offered no evidence that Mother's methamphetamine use 10 years ago or her twice-per-year marijuana use had caused any of the problems associated with substance abuse. Likewise, the Department offered no evidence to show that Mother's drinking vodka had the type of impact associated with alcohol abuse. Moreover, the evidence showed that Mother had six clean tests for drugs and alcohol, and she never once tested positive throughout the proceedings.

Even more significantly, there was no substantial evidence that Mother's drug and alcohol use posed a risk to Brandi. Mother's methamphetamine use occurred years before Brandi was born. There was no evidence that Mother had ever smoked marijuana in front of Brandi or that she left Brandi without care when she did smoke. (See *In re David M., supra,* 134 Cal.App.4th at pp. 829–830 [no basis for jurisdiction under § 300, subd. (b), because of the mother's marijuana use where there was no evidence it caused or posed a risk of causing harm to the child].) Further, there was no evidence that Mother had used marijuana on the day of the fire or that her marijuana use in any way contributed to the fire.[3] Likewise, there was no evidence that Mother's alcohol use had ever interfered with or negatively affected her ability to care for Brandi. Rather, she drank two drinks before she would leave for work as a dancer and she would not drink to the point of intoxication. Mother placed Brandi in the care of her mother when she went

---

[3]     Though LBPD investigators opined that Mother appeared to be under the influence of a central nervous system stimulant on the day of the fire, the Department offered no evidence to show the effect of marijuana on the central nervous system, and thus there was no basis for the juvenile court to infer that Mother was under the influence of marijuana at that time. It is worth noting that Ritalin, one of Mother's prescribed medications, is a central nervous system stimulant. (See Note, *Class Action Suits Prompt Governmental Action to Examine Ritalin Use and Regulation* (2001) 13 Loyola Consumer L. Rev. 380, 388.)

to work.  There was no evidence that Mother drank on the day of the fire, and no evidence that she had had a drink since Brandi had been detained.  The circumstances here are no different than those in *In re James R., supra,* 176 Cal.App.4th at page 137, where the court summarized:  "Although there was some evidence [mother] drank beer, the record does not show she was regularly intoxicated, rendering her incapable of providing regular care for the minors or posing a risk to them.  The mere possibility of alcohol abuse, coupled with the absence of causation, is insufficient to support a finding the minors are at risk of harm within the meaning of section 300, subdivision (b)."  Here, too, the Department failed to demonstrate a substantial risk of harm to Brandi arising from Mother's alleged drug and alcohol abuse, and there was insufficient evidence to support jurisdiction under section 300, subdivision (b) on that basis.

**III.    Substantial Evidence Supported the Juvenile Court's Disposition Order, With the Exception of Requiring Mother to Participate in Services to Resolve Drug and Alcohol Issues.**

   **A.    *Brandi's Removal from Mother's Custody.***

   "After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing.  [Citation.]  At the dispositional hearing, the court must decide where the child will live while under the court's supervision.  [Citation.]" (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.)  The juvenile court here removed Brandi from Mother's custody and placed her with Father.  Pursuant to section 361, subdivision (c)(1), the juvenile court may remove a dependent child from parental custody upon clear and convincing evidence of a substantial danger to the child's physical health or well-being if there are no other reasonable means to protect the child.  "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent.  [Citation.]  'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child.' [Citation.]  The court may consider a parent's past conduct as well as present

17

circumstances. [Citation.]" (*In re N.M., supra,* at pp. 169–170; accord, *In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.)

We conclude substantial evidence supported the removal order. The juvenile court's jurisdictional findings constitute prima facie evidence that Brandi cannot yet safely be returned to Mother's custody. (*In re R.V.* (2012) 208 Cal.App.4th 837, 849.) As the juvenile court acknowledged, though Mother appeared "to be working hard to get her life together," there was no indication in her testimony that she understood the dangerousness of her actions in triggering the fire, leaving Brandi in a smoke-filled apartment after the fire because she was upset with her, inconsistently meeting with her therapist and taking her medications in a manner different than prescribed. Nor did Mother offer any explanation for her frequently erratic behavior or her painting her window to keep the light out on the day of the fire. A parent's level of denial is an appropriate factor to consider when determining the risk to the child if placed with that parent. (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044.)

In asserting substantial evidence did not support Brandi's removal, Mother again focuses solely on the evidence favorable to her position, including that Brandi appeared well cared for, healthy and developmentally appropriate; and that Mother was taking steps on her own to alleviate any concerns by attending parenting classes, seeing a therapist and testing negative for drugs and alcohol. Notwithstanding this evidence, the juvenile court relied on evidence demonstrating that Mother had not fully realized the significance of her actions and had unresolved mental health issues. In examining the record on appeal, we do not search the record for evidence that would support a different result than that reached by the juvenile court; rather, we look for evidence that supports the result actually reached by the lower court. (*In re Daniel C.H.* (1990) 220 Cal.App.3d 814, 839.) At the time of disposition, there was substantial evidence of potential detriment to Brandi if she remained with Mother.

We find little similarity between the circumstances here and those in *In re Jamie M.* (1982) 134 Cal.App.3d 530, the case relied on by Mother. There, the mother was a diagnosed paranoid schizophrenic who brought her children to the police station

18

for protection one evening after she had stopped taking her medication and felt threatened by her common-law husband. (*Id.* at p. 534.) At the time of disposition, the mother was rational and coherent, under psychiatric care on an outpatient basis, and on a drug therapy program. (*Id.* at p. 536.) Nonetheless, even though there was no evidence presented to show how the mother's illness would adversely affect her children, the juvenile court determined "that a schizophrenic parent will per se be detrimental to a child," and ordered the children removed from her custody. (*Id*. at p. 537.) The appellate court reversed, holding that "[h]arm to the child cannot be presumed from the mere fact of mental illness of the parent and it is fallacious to assume the children will somehow be 'infected' by the parent," and explaining that such a diagnosis should be a starting point for the juvenile court to examine a parent's current and historical condition and its effect on the children. (*Id*. at p. 540.) Here, in contrast, the juvenile court received evidence of a specific dangerous incident that resulted from Mother's failure to understand the consequences of her actions, evidence that Mother was electing to self-medicate (or failing to medicate) notwithstanding her doctor's orders to the contrary, and evidence that Mother had not acknowledged how her mental state had contributed to Brandi's removal, instead testifying that she was losing her daughter because she had been taking Prozac. In view of this evidence of detriment, *In re Jamie M., supra,* 134 Cal.App.3d 530 does not compel a different result.

### B. *Reunification Services.*

As part of the disposition order, the juvenile court ordered Mother to participate in a number of services, including that she complete a drug treatment program, attend parenting classes, undergo a psychiatric evaluation, receive individual counseling and attend a coparenting program. Mother challenges both the order as a whole and the requirement that she participate in specific services.

As a threshold matter, we reject Mother's contention that an order for family reunification services was an abuse of discretion. The court in *In re Calvin P.* (2009) 178 Cal.App.4th 958, 963, explained: "The significant difference between family maintenance services and reunification services is that family maintenance services are

intended for situations in which children are not removed from parental custody, while reunification services are designed for times when children are removed from their parents. [¶] '[F]amily reunification services are activities designed to provide time-limited foster care services to prevent or remedy neglect, abuse, or exploitation, when the child cannot safely remain at home, and needs temporary foster care, while services are provided to reunite the family.' [Citation.] [¶] '[F]amily maintenance services are activities designed to provide in-home protective services to prevent or remedy neglect, abuse, or exploitation, for the purposes of preventing separation of children from their families.' [Citation.] [¶] 'The goal of both reunification and maintenance services is to address the circumstances which required agency and court intervention into a family's life.' [Citation.]" Relevant here, the *In re Calvin P.* court further explained that "[p]roviding family maintenance services for one parent and reunification services for the other can be appropriate in certain situations. Under section 361.2, when a child is removed from the previously custodial parent and placed with the previously non-custodial parent, the court chooses whether or not to order services for the previously custodial parent, for the custodial parent or for both parents. Section 361.2, subdivision (b)(3), provides the court 'may order that *reunification* services be provided to the parent or guardian from whom the child is being removed . . . .'" (*In re Calvin P., supra*, at pp. 963–964.) Because we have concluded that substantial evidence supported the removal of Brandi from Mother's custody, the juvenile court properly exercised its discretion to order that Mother receive family reunification services as opposed to family maintenance services.

Mother also challenges the order that she participate in specific reunification services—namely, a drug and alcohol program; psychiatric evaluation and counseling, and parenting classes. Reunification services comprise "'a crucial part of a dispositional order,'" and those services "'must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. [Citation.]'" (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010; accord, *In re Rebekah R.* (1994) 27 Cal.App.4th 1638, 1655

20

["The whole point of reunification is the elimination of those conditions which led to the assumption of jurisdiction by the juvenile court"].)  Because we have concluded that substantial evidence did not support the allegations of risk stemming from Mother's drug and alcohol use, we agree with Mother that the juvenile court exceeded its discretion in ordering that she participate in a drug and alcohol program with random testing, as those services would not alleviate the conditions that warranted jurisdiction.  (See *In re Basilio T.* (1992) 4 Cal.App.4th 155, 172–173 [reversing substance abuse component of reunification plan where there was no evidence that a substance abuse problem led to the conditions resulting in dependency], superseded on another ground as stated in *In re Lucero L.* (2000) 22 Cal.4th 1227, 1239–1240.)

On the other hand, we have concluded that substantial evidence supported the allegations concerning the risk to Brandi from Mother's mental health and her conduct in connection with the fire.  Thus, the juvenile court acted within its discretion to order reunification services comprised of psychological assessment and counseling and parenting classes, as those services were reasonably tailored to remediate the conditions that led to Brandi's dependency.  We find no merit to Mother's argument that psychological services were unnecessary because she was independently addressing her mental health issues.  To the contrary, the evidence showed that Mother saw her therapist inconsistently and had intentionally declined to take her medications as prescribed.  With respect to parenting classes, while there was evidence that Mother cared for Brandi appropriately, there was also evidence that she initially blamed Brandi for the fire and that she locked Brandi in her room immediately following the fire.  The evidence further showed that Mother lacked an understanding of how her actions had led to the dependency.  Thus, the circumstances here were unlike those in *In re Jasmin C., supra*, 106 Cal.App.4th at page 181, where the appellate court reversed an order that the mother attend parenting classes because she was nonoffending, and had neither failed to protect her children nor engaged in any inappropriate behavior.

### C. *Monitored Visitation.*

As part of the disposition order, the juvenile court ordered that Mother's visits with Brandi be monitored, no less than three days per week for three hours at a time; it also gave the Department discretion to liberalize visitation and to allow Father to be the monitor. Mother argues the juvenile court abused its discretion, asserting that her visits should have been unmonitored. "Visitation is a necessary and integral component of any reunification plan. [Citations.]" (*In re S.H.* (2003) 111 Cal.App.4th 310, 317.) The juvenile "court must define the rights of the parties to visitation. The definition of such a right necessarily involves a balancing of the interests of the parent in visitation with the best interests of the child. In balancing these interests, the court in the exercise of its judicial discretion should determine whether there should be any right to visitation and, if so, the frequency and length of visitation. The court may, of course, impose any other conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) As a part of its order, the juvenile court may delegate to the Department discretion to specify or modify the frequency and length of the visitation. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1376–1377.)

We find no abuse of discretion. The evidence showed that Mother had not yet addressed several of the concerns that led to dependency, and the juvenile court could reasonably conclude that Brandi's need for safety was best satisfied by an order for frequent, monitored visitation. Contrary to Mother's argument, *In re Brittany C.* (2011) 191 Cal.App.4th 1343 is not helpful to her position. There, after trying several unsuccessful visitation arrangements, the juvenile court ordered that visits between the mother and her quadruplets be monitored in a therapeutic setting. (*Id.* at pp. 1355–1356.) Mother seeks to rely on the argument in *In re Brittany C.* that the conditions of the order effectively denied her visitation; she asserts that the order for monitored visitation is effectively a denial of visitation. But the appellate court rejected that argument, explaining that the visitation order was an appropriate exercise of discretion given the

circumstances of the case.  (*Id.* at pp. 1356–1358.)  We, too, find the juvenile court's order an appropriate exercise of discretion.

## DISPOSITION

We reverse the jurisdiction order to the extent the juvenile court sustained the allegations in paragraph b-3, and we reverse the portion of the disposition order requiring Mother to participate in substance abuse counseling and to provide random drug and alcohol tests, and remand the matter with directions to the juvenile court to modify the orders accordingly.  In all other respects, the jurisdiction and disposition orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J. *
                FERNS


We concur:


_____, Acting P. J.
        ASHMANN-GERST


_____, J.
        CHAVEZ


_____

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23