Filed 3/19/15  In re G.J. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b).  This opinion has not been certified for publication or ordered published for purposes of rule 977.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re G.J., a Person Coming Under the Juvenile Court Law. | B256004 |
| | (Los Angeles County Super. Ct. No. CK80242) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>Shawn J.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Juvenile Court of Los Angeles County.  Robert Draper, Judge.  Affirmed.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel and Sarah Vesecky, Deputy County Counsel for Plaintiff and Respondent.

No appearance on behalf of Minor.

* * * * * *

Shawn J. (father) challenges the juvenile court's assertion of jurisdiction over his son G.J. (born August 2011). Finding no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Father and C.B. (mother) were married in California in June 2011, and moved to Las Vegas shortly thereafter; G.J. was born two months after the wedding. The marriage was short lived: A final decree of divorce was entered in Nevada in March 2012. When the relationship ended, father returned to California with G.J., and resided with his parents; mother continued to live in Las Vegas.

Prior to his marriage to mother, father had been in a long-term relationship with L.T. L.T. moved in with father in his parents' Santa Monica home in February 2012, and became a significant presence in G.J.'s life. A year later, father, L.T. and G.J. moved to an apartment in Hollywood.

On May 23, 2013, as result of his ingestion of excessive amounts of marijuana, father experienced what was later diagnosed as a drug-induced psychotic episode. During that episode, father believed that "the rapture" was imminent, and that L.T. and the baby were demonic and possessed. Father was angry and engaged in loud, aggressive behavior, including injuring mother with the shard of a broken vase, and running into Hollywood Boulevard oblivious to the traffic. As a result of this incident, father was arrested for assault, disorderly conduct, intoxication and spousal abuse; he was later convicted of the first two charges and placed on probation.

After the May 2013 altercation, L.T. and G.J. moved in with L.T.'s mother, and father returned to his parents' home. Mother learned that G.J. was being cared for by L.T. and her mother, and visited their home in Westwood. Mother was happy with the care G.J. received in L.T.'s home. Although she eventually wanted G.J. to live with her, she believed that a gradual transition to her care was in the child's best interests. Therefore, before returning to Las Vegas, mother signed a document giving L.T. permission to travel with G.J. and take him to the doctor. From June 2013 through February 2014, mother slowly increased her contacts with G.J., starting with monthly

2

visits, increasing to overnight and bi-weekly and weekly visits, until she moved into L.T.'s mother's home in February 2014. At the time of the adjudication hearing under review, mother lived in the home of L.T.'s mother with L.T., G.J., and G.J.'s two younger brothers.

Meanwhile, father filed an action in family court in December 2013 to obtain sole custody of G.J. After a hearing at which mother did not appear, father was awarded sole legal and physical custody of G.J. on January 9, 2014.

On January 27, 2014, father appeared at a police station with his family court custody order in hand and informed the officers that he wanted to pick up his son, but could not do so because L.T. had obtained a restraining order against him. Father reported that mother was not involved in the child's life. On that same date, a Children's Social Worker met with father, L.T., the paternal grandparents, extended family members and G.J. at the police station.

L.T. told the social worker the foregoing details of her relationship with father and of the May 2013 incident. L.T. also stated that she and G.J. had not had any contact with father since May 2013, that mother believed that father was not G.J.'s biological father, and that during the six years of her relationship with father, he had attempted suicide three times. L.T. explained that mother had left G.J. in her care while she lived in Las Vegas with her two younger children, ages 18 months and 4 months.

Father told the social worker that he had social anxiety. He was aware that he might not be G.J.'s father. Father confirmed that he believed "the rapture" was occurring during the domestic violence incident in May 2013; father blamed this on having smoked marijuana, but said it could not have been laced with another substance because he purchased it at a marijuana dispensary. Father denied experiencing any suicidal thoughts and also denied having any mental health issues or hospitalizations. He explained that he had not been involved in G.J.'s life since May 2013 because his attorney told him that L.T. had obtained a restraining order against him. The social worker observed "that father appeared to struggle with his memory when he stated that he did not remember his phone number and when he was not sure which date it was."

3

At the conclusion of these interviews on January 27, 2013, DCFS created a safety plan to address concerns regarding father's mental health. The safety plan provided for the minor to remain with L.T. The next day, father submitted to an on-demand drug test, the results of which were negative.

On February 3, 2014, mother met with the supervising children's social worker. Mother reported that when father lived with her, he became easily agitated and excited, and threw things for no reason. Mother described father's behavior as "flipping a switch," and explained that he would appear okay but then suddenly erupt in anger for no apparent reason. Mother did not believe that father was mentally stable. She said father smoked marijuana daily, but did not know if he smoked in G.J.'s presence. Mother said that she wanted G.J. to stay with L.T. and L.T.'s family.

Mother explained to the social worker that she worked as a live-in housekeeper in Las Vegas, and that she might lose her job if she brought another child into the home. Mother's employers described her as a good mother, reported she had been working for them for two years and caring for their children, and said they had no concerns about her parenting.

On February 5, 2014, the juvenile court authorized DCFS to remove G.J. from father,[1] but not from mother because it determined mother had made an appropriate plan for the child. When the social worker informed father of the removal order on February 6, 2014, he admitted having been hospitalized at Aurora Mental Health for substance abuse psychosis and said he was prescribed Risperdal.

On February 6, 2014, mother filed a request for modification of the family court's child custody order based on lack of notice. The family court set a hearing on the matter for March 10, 2014.

---

[1] The child was not in father's physical custody at that time, it having been determined that G.J. would remain with L.T. in accordance with DCFS's January 27, 2014 safety plan.

4

On February 11, 2014, the Department filed a Welfare and Institutions Code[2] section 300 petition pursuant to subdivisions (a) and (b), alleging G.J. was at risk due to the violent altercation between father and L.T. in which father cut L.T. with broken glass. The petition further alleged that G.J. was at risk due to father's marijuana use and his history of mental and emotional problems, including anxiety, delusional behavior, and suicidal ideation.

The juvenile court conducted a detention hearing on February 11, 2014, at which both parents were present. The court found father to be G.J.'s presumed father. The court ordered the clerk's office to obtain the family's family court file. The child was ordered to remain released to mother, with mother to remain in L.T.'s home pending further order of the court. The court furthered ordered monitored visits for father with referrals for weekly on-demand drug testing. The adjudication/disposition hearing was set for March 11, 2013.

On March 4, 2014, L.T. was interviewed by a dependency investigator in preparation for the adjudication hearing. L.T. again explained the details of the May 2013 "rapture" incident. She also described father as very demanding and possessive at times, but then normal at other times. "He had two different personalities." L.T. reported that approximately a year before G.J.'s birth, father began experiencing episodes in which he heard voices and believed the television was speaking to him. Father also checked himself into the hospital on at least three occasions because he believed he had cancer, a heart attack, or constipation. The hospital gave him Atavan to treat his anxiety, but found no physical health problems. L.T. also reported that in September of the previous year, both father and the paternal grandmother told L.T. that father had been hospitalized because he was hearing voices and had attacked his paternal aunt. L.T. said that they told her that father pushed the aunt and accused her of being demonic after she tried to stop him from jumping out of a window while he was hearing voices.

---

[2]     Further statutory references are to this code unless otherwise indicated.

5

The dependency investigator also interviewed L.T.'s mother, J.K., on March 4, 2014. J.K. said that it took three days for the family to convince L.T. to report the May 2013 abuse by father. L.T. was physically beaten up and did not want to get up to eat, shower, or do anything else. J.K. reported that she and the paternal grandmother were second cousins. The paternal grandmother was not father's biological mother. Father's biological mother had been unable to care for him due to her mental illness, which included a diagnosis of bipolar and possibly schizophrenia. Father's biological mother was psychiatrically hospitalized several times and committed suicide approximately four years earlier.

In an interview with the dependency investigator on March 7, 2014, father denied that he had engaged in domestic violence with L.T. in May of 2013. He acknowledged that he had been admitted to a mental hospital after that incident. Father said his medical report documented that he was not experiencing hallucinations or suicidal or homicidal tendencies, and that if he did not smoke marijuana, he would be fine. Father had been told he had experienced a substance abuse induced psychosis, and that he should not use drugs. When asked about the report that he had tried to jump out of a window, father stated, "Yeah, that did happen because I was smoking marijuana, and I did have that paranoia about the rapture, same as on Hollywood Boulevard. And I did try to jump out the window, but it was open and it was only five feet off the ground. I tried to climb through the window." Father said he last used marijuana on May 23, 2013, and attended NA 12-step meetings; he showed the investigator his nine-month chip from NA. He was also enrolled in a basic parenting skills class, and said he was willing to participate in a psychiatric evaluation and a coparenting class.

DCFS filed an addendum report with the juvenile court on March 11, 2014. DCFS referenced father's medical records documenting his hospitalization between May 29 and May 31, 2013, including his attempt to jump out of a window on May 29, 2013. Father's discharge diagnoses were: (1) Mood Disorder, NOS; (2) Nondependent Abuse of Drugs, Cannibis Abuse, Continuous; and (3) Nondependent Abuse of Drugs, Amphetamine or Related Acting Sympathomimetic Abuse, Continuous. Father was prescribed Atavan

6

and Risperdal and advised to obtain follow-up mental health services at Edelman Mental Health Center.

The juvenile court conducted the combined jurisdiction/disposition hearing on April 11 and April 14, 2014. The court received DCFS's reports into evidence, as well as the results of father's on-demand drug tests since the February 11, 2014 detention hearing, all of which were negative.

Father testified to having a problem with poly substance abuse, and said that he experienced a substance psychosis on May 23, 2013 due to smoking too much marijuana. He stated this was a one-time incident when he was not in his right mind; "[t]hat is why I have been taking every effort not to smoke marijuana again." Father also stated that, as he was running out of the house on May 23, 2013, L.T. tried to step in order to protect him, but bumped into a table and scratched her stomach. Father regretted what happened on May 23, 2013, and said that he did not intend to hurt L.T. Father did not deny having a history of substance abuse and said he was "still a recovering addict."

Father also testified that he was prescribed psychotropic medication after he left the hospital and was told to take it for one month, the period of time marijuana stays in one's system. Father was feeling okay after this one month period, and stopped taking the medication. Father had attended 48 to 50 NA sessions; he did not yet have a sponsor, however, as "it is hard to get a sponsor and start working the steps."

Father stated that his conduct on May 23, 2013 resulted in his conviction for making a nuisance in public and intoxication. He testified that he was in compliance with the criminal court's orders.

L.T. also testified at the April 2014 adjudication hearing. She again explained the circumstances of father's "rapture" episode on May 23, 2013. L.T. testified that father cut her that day with a broken vase, slicing her side, as she tried to leave the building. This testimony conflicts with a declaration she executed, which stated that she was cut by

7

a piece of broken glass on the floor. Although father was angry and violent during this episode, she believed that father's conduct was the result of a delusion. She therefore concluded he should not go to jail and requested that he be released to her. L.T. did not report this incident to the police until three days later, at the urging of her parents. Again, L.T. felt that father needed a mental evaluation rather than incarceration.

Father sees G.J. twice a week for one hour at DCFS offices. L.T. stated that G.J. is hyper and tense when he returns from these visits, unlike his demeanor before the visits. L.T. also testified that mother is "amazing" with her three boys and has been providing adequate supervision when she is not working.

The minor's counsel asked the juvenile court to sustain counts b-2 and b-3 which alleged father's mental health issues and substance abuse; she did not address the domestic violence count. Minor's counsel asked the court to maintain the child with mother, order visits for father, and expressed her belief that father would benefit from a mental health evaluation.

County counsel asked the court to sustain the petition, but said he would submit on whether the domestic violence count fell within subdivision (a) or (b). Mother's counsel noted his client was nonoffending but had submitted to the jurisdiction of the court. He asked that the court maintain the child in mother's care.

Father's counsel asked the court to dismiss the petition. He argued that the petition was based on an incident that occurred nearly a year earlier, and that father had been testing negative for marijuana.

The juvenile court began its findings by stating: "I agree that the incident was a while ago, but it was very serious and disturbing, and there have been other somewhat bizarre actions since then, such as reporting [L.T.] to the police as having kidnapped G.J." The court sustained the petition pursuant to section 300,

subdivision (b),[3] and ordered that father be evaluated pursuant to Evidence Code section 730.

Father timely appealed the court's finding of jurisdiction.

DISCUSSION

On appeal, father maintains that insufficient evidence supports the juvenile court's order assuming jurisdiction over G.J. under section 300, subdivision (b). Specifically, father argues that the single incident of violence in May 2013, when father was under the influence of marijuana which resulted in a drug-induced psychosis and an involuntary hospitalization, does not establish a current substantial risk of serious physical harm or

---

[3]      As sustained, the petition reads:

"b-1:  On a prior occasion in May of 2013, the child G[.J.]'s father, Shawn J[.] and the father's female companion, L[.]T[.], engaged in a violent altercation, in which the father cut the female companion's stomach with broken glass, inflicting a laceration on the female companion's body. Such violent conduct on the part of the father against the female companion endangers the child's physical health and safety and places the child at risk of physical harm, damage and danger.

"b-2:  The child G[.J.]'s father, Shawn J[.] has a history of mental and emotional problems, including anxiety, delusional behavior, suicidal ideation and suicide attempts, which renders the father incapable of providing regular care of the child. On a prior occasion, the father was involuntarily hospitalized for the evaluation and treatment of the father's psychiatric condition. The father failed to take the father's psychotropic medication as prescribed. The father's mental and emotional condition endangers the child's physical health and safety and places the child at risk of physical harm and damage.

"b-3:  The child G[.J.]'s father, Shawn J[.], has a history of substance abuse and is a current user of marijuana, which renders the father incapable of providing regular care and supervision of the child. On prior occasions, the father was under the influence of marijuana while the child was in the father's care and supervision. The father's substance abuse endangers the child's physical health and safety and places the child at risk of physical harm and damage.

9

illness, as required by section 300, subdivision (b). We conclude substantial evidence supports the order.

Section 300, subdivision (b) provides in pertinent part that a child may be declared a dependent of the court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse. . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (§ 300, subd. (b).) "Thus, '[t]he three elements for jurisdiction under section 300, subdivision (b) are: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.'" [Citations.]' (*In re B.T.* (2011) 193 Cal.App.4th 685, 691–692.)" (*In re John M*. (2012) 212 Cal.App.4th 1117, 1124.)

"We review the dependency court's jurisdictional findings for substantial evidence, and review the evidence in the light most favorable to the dependency court's findings and draw all reasonable inferences in support of those findings." (*In re John M*. (2013) 217 Cal.App.4th 410, 418.)

By his own admission, father had a substantial history of substance abuse. Indeed, father ingested so much marijuana that it triggered a psychotic response. Courts have long recognized that long-standing and chronic substance abuse is a serious problem that cannot be ameliorated in a few months. Moreover, father did not enroll in a drug treatment program, and though he attended weekly NA meetings, he did not have a sponsor and was not "working the steps." Nor had father followed through with mental health services after his discharge from the psychiatric facility in May 2013.

10

Father relies on *In re J.N.* (2010) 181 Cal.App.4th 1010 to argue that the May 23, 2013 incident does not support a finding of risk of harm. In that case, a father attempted to drive mother and their three children home after drinking at a restaurant. The family became involved in a car accident, in which the children were injured. It was determined that both parents were intoxicated; the parents were arrested for child endangerment and jailed. (*Id.* at pp. 1016-1019.) However, unlike the present case, there was no evidence that either parent had an ongoing substance abuse problem, or even that they consumed alcohol on a regular basis. The *J.N.* court believed that the parent's conduct was an isolated incident, and that the children were therefore not at substantial risk of serious physical injury as a result of their parents' inability to adequately supervise or protect them. Although the court reversed the juvenile court's jurisdictional orders in that case, it acknowledged that "[t]he nature and circumstances of a single incident of harmful or potentially harmful conduct may be sufficient, in a particular case, to establish current risk depending upon present circumstances." (*Ibid.*)

In the present case, there was evidence that father had a significant substance abuse problem over a period of years. There was also evidence of multiple psychiatric hospitalizations, and that he continued to hear voices months after he reported having ceased using drugs.

In short, because G.J. was just two years old at the time of the adjudication hearing, father's substantial history of recent substance abuse was prima facie evidence of his "inability [] to provide regular care resulting in a substantial risk of physical harm." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 767; accord *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219.) The juvenile court's jurisdictional finding is thus supported by substantial evidence, and the court properly asserted jurisdiction over G.J.

11

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

GOODMAN, J.[*]

We concur:


MOSK, Acting P.J.


KRIEGLER, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.