Filed 6/26/24  In re Juan H. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re JUAN H. et al., Persons Coming Under Juvenile Court Law. | B331262<br><br>(Los Angeles County Super. Ct. No. 23CCJP01716) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>MELISSA G. et al.,<br><br>     Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Reversed.

Katie Curtis, under appointment by the Court of Appeal, for Defendant and Appellant Melissa G.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant Juan H.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

_____

In July 2023, the juvenile court found that children Juan H. (born September 2008), Nickolas H. (born April 2011), Julissa H. (born March 2014), and Emilio H. (born March 2019), were persons described by Welfare and Institutions Code section 300, subdivision (b), and ordered services to be provided under section 360, subdivision (b).[1]  Specifically, the court found that appellant-father Juan H. had stored a loaded gun where the children could access it; that, during an argument Father had with appellant-mother Melissa G., Nickolas had taken the gun; that Mother knew or should have known that the children had access to the gun; and that, at the time of the hearing, the children were still at substantial risk of serious physical harm.

On appeal, both parents argue that substantial evidence does not support any of the court's findings and that, because the

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.  Section 360, subdivision (b), provides that "[i]f the court finds that the child is a person described by Section 300, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker for a time period consistent with Section 301."

court erred in finding the children were persons described under section 300, it also erred in proceeding under section 360. We conclude that substantial evidence does not support the court's finding that the children were still at risk at the time of the hearing and therefore reverse without addressing the parents' other contentions.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *Previous Allegation of Domestic Violence*

In October 2021, DCFS received a referral for domestic violence. When told that his parents would have to be called regarding his poor school grades, Juan asked his teacher not to call them, claiming that Father "routinely hits, punches and kicks mother"—with the most recent incident occurring the previous month—and that Juan needed to stay awake to ensure Mother was safe. Juan "was observed by school staff to be withdrawn, tearful, and upset." When interviewed by DCFS, however, Juan denied any violence had happened recently but claimed his parents "did used to physically fight a lot with each other until one year ago" and they "were mutually physically aggressive."

Father refused to speak with DCFS. Mother acknowledged the parents would argue, but denied any violence, implying that Juan was simply upset about recently being disciplined. Mother admitted throwing clothes at Father years ago.

Julissa also recalled Mother throwing items at Father during an argument. However, she claimed that the parents had

---

[2] We limit our summary to the facts and procedural history relevant to the issues appellant raises on appeal.

changed and now when they argued, "usually one of them leaves the home to calm down." Nickolas stated that the arguments "sometimes . . . become physical" and recalled an incident in which Mother threw a shirt at Father, and Father left the home. He said the last incident occurred "when he was little"; he could not say how many years ago.

The case was closed as "**Inconclusive** with a disposition of Situation Stabilized."

### B. *DCFS Investigates a Referral*

### 1. DCFS Receives a Referral

In April 2023, DCFS received a referral alleging general neglect and emotional abuse regarding the four children. The referral stated that adult sibling Shirley had reported receiving a call from Nickolas, who claimed their parents were fighting and that the "situation was getting scary," and so he "took it upon himself to get his father's handgun to prevent it from being used during" the fight. Shirley added that Father had previously threatened Mother with the gun. Shirley called both 911 and another adult sister (Emelly) to go check on the parents and children. According to the referral, when law enforcement arrived, Nickolas confirmed his parents were verbally arguing— although he denied they were physically fighting—and also "admitted that he obtained his father's handgun, during his parent's [*sic*] verbal argument, from his parent's [*sic*] bedroom closet." The referral claimed that "father's loaded handgun was kept inside an unlocked box inside of the parent's [*sic*] bedroom closet at easy access to all the children in the home" and that "Nickolas held onto the loaded handgun until his father Juan noticed [it] in Nickolas'[s] hands . . . [and] asked Nickolas to put

4

the handgun down, which he did, by placing it on the floor. The father then picked up the handgun from the floor" and the children left the home. The referral also claimed that "Nickolas was visibly shaken and he was a bit reluctant to say much for fear of being taken into protective custody."

The referral related that another child, Julissa, confirmed her parents were fighting and "reported seeing 'everyone' fighting over the gun and they were trying to push the handgun into the couch [*sic*]." Mother confirmed Father owned a gun, but asserted that "he keeps it locked." She also denied any physical violence occurring, although she admitted to past unreported domestic violence incidents. Father was arrested for "Child Endangerment because his handgun was not secured and at easy access to his children."

### 2. DCFS Interviews the Family

Six days later, a children's social worker (CSW) visited the family home to interview the family. Mother stated that, on the day of the incident, she and Father had gotten into an argument over the fact that Mother's cellphone was set to receive silent notifications. This escalated into mutual yelling—but no violence—and Mother took the kids to McDonald's to "cool off." The children were nervous because the parents were arguing, and Mother knew that Nickolas had called Shirley. When she and the children returned home, law enforcement was already present.

Mother and the children were questioned about a gun that law enforcement found in a dresser. Mother claimed that, when she left the home, the gun had been in a lockbox in the closet, and denied that Nickolas had ever taken the gun during the incident. Mother admitted she did not know what happened with the gun

5

after she left, but she was certain it had not been in the dresser when the incident happened.[3] Mother insisted the gun "is always locked and has triple security," and Father was the only one with the key for the lockbox. Mother denied Father had ever threatened her with the gun. Mother also reported that when the police had been interviewing Nickolas, "he was walking away and he was nodding his head to every question without answering."[4] Mother stated that a court had issued a protective order protecting the three younger children from Father, and that the parents were complying with the order. Mother believed Shirley called law enforcement because she was upset with Father; Shirley and Emelly had "moved out of the home about 7 months ago due to a conversation they had with father (who is their step father)" about their lack of employment despite not attending school. Mother denied there ever being physical violence between her and Father.

Juan told the CSW that he had been sleeping in his room when the fight began. He "reported he could hear the parents arguing something about cell phone notifications" and that they "were not yelling, but were speaking loud." He "woke up" when Mother came into the room and told him they were leaving. They walked to McDonald's so that each parent could cool off. Juan denied seeing a gun during the incident but stated that Nickolas

---

[3] Mother claimed that, before she left the home, "she got money out of the dresser" and "the gun was not there."

[4] Mother explained that Nickolas had an IEP at school "due to having short term memory loss and having learning attention difficulties." DCFS later confirmed that Nickolas had an IEP and learned that he was in special education classes and was not performing at grade level.

"was sad and nervous, and told [him] that he had thoughts of pulling out the gun."

Nickolas refused to be interviewed, stating that he neither wanted to look at nor speak with the CSW. Julissa spoke with the CSW but knew no more than that the parents had argued—she did not see Nickolas or anyone else holding the gun during the incident. Emilio stated that Father "went to jail because he was being bad and he was screaming."

Three weeks later, the CSW spoke with Father. He admitted he argued occasionally with Mother but denied any domestic violence or ever threatening Mother with a gun. He confirmed that the gun was usually stored in a lockbox to which he was the only person with the key. During the argument with Mother, he stated the gun remained in the lockbox but, after Mother left with the children, he "took the gun out of the lock box and put it in a drawer next to the bed" because he was "struggling with depression." However, Father "denied having any thoughts of hurting himself." He cited the incident as an "eye-opener" but refused to be referred to therapy or counseling. Father also informed the CSW that the restraining order had been modified to allow him to return home. Father stated that the gun was currently with the police. DCFS later learned that the charges against Father were dismissed, and he was permitted to pick up his gun from the police station.[5]

In mid-May 2023, the CSW spoke with Shirley, who claimed she and Emelly had moved out of the home in January due to Father "kicking her out." Shirley claimed the last time

---

[5] It was reported that on May 5, 2023, "the People announced they are unable to proceed to trial" and the matter was dismissed.

there had been any domestic violence between the parents was two or three years ago, but that Father had physically abused Mother and "hit her everywhere on her body." As for the incident, she related that she had received a phone call from Nickolas, who was "distraught and crying," causing her to have a hard time understanding him. Nickolas told her that the parents were fighting and Shirley assumed the fight was physical, because that had occurred in the past. Shirley continued that "Nic[k]olas did not say who had the gun and he stated that it was outside and not where it was supposed to be."

### 3. DCFS Reviews the Police Reports

A few days later, DCFS received police reports regarding the incident. The reports stated that, upon arriving at the family home, the officers knocked several times, but no one answered. Emelly then approached the officers and repeated the claim that Nickolas had told Shirley he had taken Father's gun when the parents were fighting. Emelly appeared "very distraught," and informed officers that Father had physically abused and threatened Mother with a gun in the past, and that Mother had never reported the incidents out of fear of retaliation. Emelly stated she was afraid Father had killed Mother because neither Nickolas nor Mother were answering their phones. Emelly let the officers into the home with her key. They entered, and saw Father lying on his bed. They ordered him to stand and turn around to be handcuffed; Father "immediately began cursing" and demanding to know why the officers were present. Father was handcuffed without further incident but, when ordered to go outside, "began delaying" the investigation, refusing to go outside and "placing his feet on the frame of the front door" to prevent law enforcement from walking him outside. Father also

8

"drop[ped] his body weight" and "fell back onto the ground on his back where he remained." Eventually Father was escorted outside and, while there, Mother and the children returned home. Mother explained that the parents had not physically fought but were arguing over cellphone notifications, and that she had neither been threatened with nor seen a handgun during the dispute. However, she also "confessed to past domestic violence incidents with" Father "years ago, which she never reported[,] but denied any recent incidents."

Nickolas appeared to be "visibly shaken" and "crying uncontrollably." He hugged Emelly and "told her he was scared and sorry." An officer asked him if he had seen a physical altercation between his parents and he stated he had been in his room when he heard them arguing. This scared him "due to witnessing past verbal altercation[s] between" the parents, "which prompted him to retrieve [Father]'s firearm, which was in [Father]'s bedroom." Nickolas "stated he grabbed the firearm from the bedroom closet, which was in a box unlocked and readily available for him to use." After getting it, he did not know what to do with it, "so he pointed the firearm at the floor." He also confirmed calling Shirley and telling her that Father was hitting Mother, and that he (Nickolas) had grabbed Father's gun. Nickolas then looked at the officer, "frightened," and refused to speak any further. He admitted he had not seen Father hit Mother that day or any other day and "repeatedly stated he was done speaking to [the officer] and wished not to make any further statements."

Julissa told the officer that "she observed [Father] along with everyone else trying to push the handgun inside the couch." She was unable to explain what she meant by that. She also

9

claimed the gun was "silver and orange." The officers retrieved a silver handgun—containing a magazine with seven live rounds and one in the chamber—from a dresser drawer directly next to the bed on which they had found Father. Also in the drawer were "extra loose ammunition" and "an extra loaded magazine with eight live rounds inside." In the closet was a box of ammunition.

Father admitted to owning the handgun, but stated it was "always locked, and secure inside his residence and only he has access and a key to open his lock box." He denied any physical altercation with Mother, denied seeing any of his children with the handgun, and denied having the gun himself. He refused to make any other statements. The officers determined no domestic violence had occurred but arrested Father for child endangerment, unlawful storage of a firearm where a child could access it, and delaying a police officer performing their duty. The police confiscated the gun.

The day after Father was arrested, he agreed to explain to a police officer what had happened. After he and Mother had argued for 15 to 20 minutes, Mother decided to leave the home and walk to a local McDonald's. Father then retrieved the gun from his lockbox, stating "he felt depressed because he feels stuck at his job and doesn't feel like he's progressing." He then "held the gun and wanted to kill himself" but did not, after thinking about how "his children would feel without a father." He "placed the gun inside a small dresser located adjacent to his bed and fell asleep." He was awakened by the police and detained inside the home; he was upset because no one explained the situation to him. Father claimed no child had ever retrieved his gun from his home and denied any previous or current domestic violence with Mother.

## C.  *DCFS Files a Petition*

Two days after reviewing the police reports, DCFS filed a petition on behalf of Juan, Nickolas, Julissa, and Emilio, alleging causes of action under section 300, subdivisions (a) and (b)(1). Count a-1 alleged that the parents had a history of engaging in violent altercations in the children's presence, that they had a "violent verbal altercation" in April 2023 during which Nickolas grabbed Father's gun (with which Father had previously threatened to harm Mother), and that Father was arrested for unlawful storage of a firearm and child endangerment as a result of this incident.  Count b-1 contained the same allegations and added that Mother failed to protect the children in that she permitted Father to reside in the family home.  Count b-2 alleged that Father "created a detrimental and endangering home environment for the children" because, in the April 2023 incident, he "placed the loaded firearm . . . within access [*sic*] to the children," that Nickolas had gotten a hold of the gun in April 2023, and that Mother "knew or reasonably should have known, of the firearms placed within access to the children" but failed to protect them.  Count b-3 alleged that Father had mental and emotional problems, including symptoms of depression and suicidal ideation, rendering him incapable of caring for the children.  The petition indicated the children were not detained. A last minute information filed before the initial hearing informed the court the children were still living with the parents, and Father had yet to retrieve his gun from the police station and stated he had no plans to do so.

At the initial hearing in June 2023, the court found a prima facie case that the children were persons described by section 300, but that reasonable services were available to prevent

11

detention; the court therefore ordered the children to remain with the parents under DCFS supervision. DCFS was ordered to, among other things, obtain the children's birth certificates. The court also ordered the parents to stop fighting and not to have any guns in the house. The court admonished the parents that they needed to work out their differences "and not be scaring anybody to the point where somebody like Nickolas grabs a gun and caps off a round."

### D. *DCFS Continues to Investigate*

In June 2023, a dependency investigator (DI) spoke with Mother to explain who she was and to schedule an interview with the family. Mother complained that too many people were coming to the home to speak with the children and had "traumatized them," calling the case "all hearsay and . . . lies." Mother also lamented that when law enforcement came to her house, they asked the parents whether they had tattoos or were involved in gangs. Mother additionally complained the court had "yelled at them to be quiet" at the court hearing. "After twenty minutes of complaining about the same issues, mother agreed to let DI come out to the home the following day at 10am to interview the parties. Mother stated that is father's day off from work, he will be home for the interview, and she wants the interviews completed in the morning so that they can enjoy the rest of their day." However, despite the court's order that DCFS include copies of the children's birth certificates in the next report, Mother refused to produce them, stating: "That bothers me, no you can't see them. I'm not guilty and you're invading my privacy. And I don't want this information anywhere." She acknowledged the court's written order but insisted, "I want the judge to tell me."

12

The DI arrived at the family home the next day and interviewed the parents and the children, with the exception of Emilio (who was too young to make a meaningful statement) and Nickolas, who refused to speak with the investigator, despite Mother's encouragement to do so. Mother explained that Nickolas "has a history of shutting down when it becomes overwhelming for him."[6] She also opined the police did not properly interview him, failing to account for his delayed development. "Mother stated that she told the police repeatedly" that Nickolas functioned "at the level of a child in kindergarten." She claimed he was "walking away from the police officer but the officer kept following him and asking him yes or no questions." Mother also claimed that after the police left, "Nickolas cried and told her that the police officer 'put words in my mouth' and he did not know how to stop it."

### 1. Mother

Mother apologized to the DI for her outburst the previous day and produced copies of the birth certificates for the DI to photograph. When asked about the allegations in the DCFS petition, Mother claimed they were all false, except that Father was indeed arrested. However, she asserted he was "wrongly accused and wrongly arrested, and the DA's office dropped his case." She admitted she and Father could have "loud" arguments, but denied it ever became physical. She explained that the father of her two adult daughters was violent, but Father was "nothing like that." Mother explained that, on the day of the incident, she and Father argued because the

---

[6] Nickolas's school counselor later confirmed this.

notifications on her cellphone were set to silent and, consequently, she did not notice a text Father had sent her. As the argument got louder, Mother decided to take the kids and leave, walking to McDonald's. She left her phone at home. While at McDonald's, Emelly texted one of the children, stating they needed to come home as soon as possible or the police would arrest Father.

When they arrived home, they saw at least ten police officers present and Juan turned around and went back to McDonald's, saying "he didn't want to deal with it." Father was in the back of the patrol car. "Nickolas was crying, and he was refusing to talk to the police officer, but she kept following him and asking him questions and he was just trying to get away." Mother explained to the police officer that, "I know he's tall and he's twelve, but he doesn't think and act like a twelve year old. I told her, I made it clear, he's at the level of someone in kinder[garten]. The lady cop kept telling me to shut up, she was really rude, she did not listen to what I had to say, and she just kept following Nick to make him answer her questions."

Mother claimed that the gun was always in a locked case, and no one was holding it during the argument. However, she admitted that she saw law enforcement "pull the gun out of the dresser," and concluded Father must have taken it out after she left. She did not believe "Nickolas actually said those things to the police. He was crying and really upset, he doesn't talk when he's upset. He shuts down. I saw him trying to run away from her, but she kept chasing him. He has short term memory loss, he can't learn and understand like other kids, I'm not sure he understood what the police was asking him."

However, Mother did believe that Shirley and Emelly "said those things about the past" because they were "hurt." She explained that their biological father—who had physically abused her—was in prison for attempted murder and Mother raised Shirley and Emelly with the help of the maternal aunt and grandmother. Mother stated she had been married to Father for 15 years, and Father had also raised the two adult children, but they were "taking advantage of us" by living at home without working, going to school, or even doing chores. When they were given an ultimatum of going to school or getting a job, they moved out.

Mother stated the family was willing to comply with court orders and was on a waiting list for marriage counseling.

### 2. Father

Father echoed Mother's sentiments that they argued, sometimes loudly, but never physically fought. He also denied Nickolas had ever held the gun, stating the gun was kept in a lockbox, to which he was the only one with a key. He stated that on the day of the incident, after Mother and the children left, he took the gun out, cleaned it, and then "put it into the dresser and went back to sleep." Father stated he was going to put the gun back in the lockbox "but I was sleepy." When he woke up, he saw police officers in the house; they did not explain how they had gotten in or why they were there. Father stated he knew that Shirley and Emelly were mad at him. When asked if he would attend therapy, Father stated he would if it were ordered, but he did not need it.

### 3. Juan and Julissa

Juan admitted his parents argued, sometimes loudly, but denied that they physically fought. He claimed that when they argued, one would leave the home so both could calm down. On the day of the incident, Mother took the children to McDonald's after she argued with Father. While there, they received a text message from their sister Emelly to come home and they did, finding law enforcement present. Juan "didn't want to deal with it," and so he returned to McDonald's. Juan denied that Nickolas had taken the gun during the incident although, after the police had left and Juan came home, Nickolas told him "that he thought about getting the gun." Juan claimed the gun was kept in Father's lockbox, and Father never left it lying around or let the children play with it. Juan also denied Father had any mental or emotional problems. When asked about the domestic violence report he made in 2021, Juan replied, "I lied about that. I lied about my parents fighting. I don't know why I did. I don't remember really."

Like Juan, Julissa also claimed her parents argued, but did not physically fight. She also denied Nickolas having a gun. She did not recall telling the police that anyone tried to "push[] the gun into the sofa."

### 4. Shirley and Emelly

The DI attempted to interview both Shirley and Emelly, leaving two voicemails and sending two text messages to each sister. Neither responded.

### 5. Conclusions

DCFS concluded that Shirley and Emelly were not credible witnesses, and that due to Nickolas's disabilities, it was unclear

how credible the report of his statements was.  Further, DCFS did not believe the allegations of domestic violence could be proven.  DCFS stated that "[t]he one issue that can be proven to be true, is that father was arrested for unlawful storage of a firearm.  The police located a loaded handgun in the dresser, next to the parents' bed, in the bedroom used by parents and the children Emilio and Julissa."

DCFS advised that they could not proceed with a contract under section 301 because "DCFS policy is clear, the identified perpetrator must be willing to remain out of the home."[7] Therefore, DCFS recommended the court proceed under section 360, subdivision (b).

---

[7] Section 301, subdivision (a), provides that "[i]n any case in which a social worker, after investigation of an application for petition or other investigation he or she is authorized to make, determines that a child is within the jurisdiction of the juvenile court or will probably soon be within that jurisdiction, the social worker may, in lieu of filing a petition or subsequent to dismissal of a petition already filed, and with consent of the child's parent or guardian, undertake a program of supervision of the child.  If a program of supervision is undertaken, the social worker shall attempt to ameliorate the situation that brings the child within, or creates the probability that the child will be within, the jurisdiction of Section 300 by providing or arranging to contract for all appropriate child welfare services pursuant to Sections 16506 and 16507.3, within the time periods specified in those sections.  No further child welfare services shall be provided subsequent to these time limits.  If the family has refused to cooperate with the services being provided, the social worker may file a petition with the juvenile court pursuant to Section 332. Nothing in this section shall be construed to prevent the social worker from filing a petition pursuant to Section 332 when otherwise authorized by law."

**E.** *The Court Proceeds Under Section 360*

In the July 2023 adjudication hearing, the court noted that DCFS had filed an amended petition that struck all counts but b-2 (alleging that Father created a dangerous home environment by placing a loaded firearm where the children could access it, that Nickolas had gotten a hold of the gun, and that Mother knew or should have known that the children had access to the gun but failed to protect them). The court then heard argument from counsel.

Counsel for the children, counsel for Mother, and counsel for Father all asked the court to dismiss the petition. The children's counsel stated there was "some confusion about whether [Nickolas] did get the gun," and reminded the court that Nickolas functioned "at a kindergarten level," that he was frustrated with how law enforcement interviewed him, and that Shirley admitted she did not understand what Nickolas was telling her. Counsel added that whatever risk there was to the children on the day of the incident, with the gun out of the house, there was no current risk to them. The court asked counsel what was to stop the parents from getting another gun "and doing this all over again." The children's counsel responded that the parents "understand why they're here" and "understand why they need to keep the gun in a lock box" and opined that a petition should not be sustained "because [of] something that could happen" or because "we have gut feelings or fears of what could happen in the future."

Mother's counsel joined the argument articulated by the children's counsel and added that the evidence demonstrated Mother was not present, did not know the gun was not in the

18

lockbox, and neither retrieved nor encouraged Father to retrieve the gun from the police after they were able to do so.

Father's counsel also joined the arguments articulated by the children's counsel and pointed out that even DCFS believed count b-2 to be only "partly true" because the allegation regarding Nickolas holding the gun was based on statements made by the older siblings who were unreliable witnesses due to the animosity between them and the parents. Father's counsel added that, while the firearm was put in a dresser drawer, the children were not home when this occurred.

DCFS's counsel recounted Nickolas's statements from the police report, pointed out that the police had no incentive to lie, and argued that if Nickolas knew that the gun was in a place accessible to him, Mother also knew or at least should have known that the gun was accessible to the children. Counsel discounted the dismissal of the criminal charges against Father, noting that the district attorney was bound to a different standard of proof.

The court stated that "it may well be the case that the parents have learned their lesson, but there's no way to know for sure unless we make sure that they go through the lessons that will cement in their mind the issues that need to be addressed in this case." The court continued that guns needed to be stored away from children, "especially a child like Nickolas" because "he is not responding the way a 12-year-old would respond and that puts him and the other children at risk." The court then stated: "I don't know whether or not Father or Mother is going to exercise their rights and get another gun into the house, could well be the case. But we need to train them up and make sure that they understand if they're going to exercise that right, they

19

have to do it in a responsible manner so that nobody has access to the weapons.  So for those reasons, I have to find the b-2 true as pled."

The court stated it agreed with DCFS that continuing jurisdiction was unnecessary but found that the involvement of social workers was needed to address the conflicts between the parents "so we don't have a situation arise where somebody reacts the way Nickolas did and gets a weapon to purportedly protect the mother or the father or himself or somebody else." The court added that even though the gun in the incident was no longer at the home, it was too easy for the parents to get another gun, and thus the risk would not be ended "until you're trained and understand what the risks are and know how to have the gun, if there's a new one, around the children safely."  The court also pointed out that Father left the gun "unsecured in someplace where one of the children could get their hands on it."  The court concluded that it was "more likely than not true that the children are still at substantial risk until the parents learn what they need to learn about safely maintaining weapons around the children if they want to get another weapon.  And there's no reason to believe that they are not going to exercise that right."

The court sustained count b-2 and found the children were persons described under section 300.  Pursuant to section 360, subdivision (b), the court placed the children under DCFS's supervision for a period consistent with section 301.

Both parents timely appealed.

## DISCUSSION

Jurisdiction under section 300, subdivision (b), " 'requires a showing that *at the time of the jurisdictional hearing* the child is

at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).'" (*In re B.T.* (2011) 193 Cal.App.4th 685, 692, emphasis in original.) "[E]vidence of past conduct may be probative of current conditions." (*In re James R.* (2009) 176 Cal.App.4th 129, 135.) But to establish a defined risk of harm at the time of the hearing, "[t]here must be some reason beyond mere speculation to believe the alleged conduct will recur." (*Id.* at p. 136.)

Here, the court admitted it did not know whether the parents would get another gun but opined that this "could well be the case" and "there's no reason to believe that they are not going to exercise that right" to buy another gun. To the extent the court found the children were at risk because the parents failed to demonstrate they were not going to purchase another gun, this was error.

"Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300." (§ 355, subd. (a).) In other words, the burden was on DCFS to prove that the children were still at risk at the time of the hearing because it was more likely than not that the parents would purchase another gun *and* would fail to secure that gun in a manner that would prevent the children from accessing it. DCFS failed to meet this burden. There is no evidence in the record that the parents intended to purchase another firearm. In fact, the only evidence in the record suggested otherwise—Father informed DCFS that he had no plans to pick up his gun from the police station; Mother likewise had no plans to pick it up. Similarly, Father admitted it was "stupid" of him to take the gun out and wished he had not done so. He stated the incident had been an "eye-opener" for him.

21

DCFS contends the children were still at risk because "the parents denied any responsibility for their conduct, and they had not engaged in any services for counseling or gun safety." DCFS also cites Father's "changing version of events" regarding how the gun ended up in the dresser, the children's statements contained in the police report about Nickolas getting the gun, and the fact that loose ammunition and another loaded magazine was found in the dresser.

While this evidence may support the court's finding that Father improperly stored his gun in a place accessible to the children, only the parents' alleged refusal to engage in "gun safety" classes relates to the children's continuing risk at the time of the hearing. However, there are two problems with DCFS's argument. First, it is unsupported by the record. None of DCFS's citations to the record support the claim that the parents were asked, let alone refused, to take gun safety classes. Second, gun safety classes would be relevant only if there was evidence to support a conclusion that the parents intended to have firearms in the home again. As discussed above, such evidence is lacking.

Because the court erred in finding the children were persons described under section 300, it also erred in proceeding under section 360. Given our conclusion, we need not address the parents' argument that substantial evidence does not support the other findings made by the court in sustaining count b-2.

22

## DISPOSITION

The court's order is reversed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.