Filed 5/22/26  In re Isaac G. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re ISAAC G., a Person Coming Under Juvenile Court Law. | B349677 <br><br> (Los Angeles County Super. Ct. No. 25CCJP00309) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LUCAS C., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Judge Pro Tempore.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

————————————————————

After the juvenile court found true allegations that appellant-father Lucas C. sexually abused minor Jennifer G. (born Feb. 2008)—the daughter of his then-girlfriend, S.G.—the court assumed jurisdiction over both Jennifer and Father's son, Isaac G. (born Oct. 2021).[1] The court then removed Isaac from his custody. On appeal, Father contends: (1) substantial evidence does not support the court's assumption of jurisdiction; and (2) because the court should not have assumed jurisdiction, its dispositional order was also erroneous. We find substantial evidence supports the court's assumption of jurisdiction and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *DCFS Investigates a Referral*

In early January 2025, respondent Los Angeles Department of Children and Family Services (DCFS) received a referral alleging Father had raped Jennifer in 2021 when Mother was at work, had continued sexually abusing her since Jennifer and Mother had moved into the same apartment complex where

---

[1] S.G. is the mother of both Isaac and Jennifer, but Father is not Jennifer's father. Jennifer's father is deceased. Mother is not a party to this appeal.

Father lived five months ago, and had threatened Jennifer over telling anyone about the abuse.

A children's social worker (CSW) called Mother and informed her "that a report had been generated alleging concerns for the safety and wellbeing of her children." Mother responded that "her children were fine and there are no issues in her home." Mother said she was currently out with the children but would return home soon.

### 1. Jennifer

After Mother informed the CSW she had returned home, the CSW went to the family home and spoke with Jennifer. Upon being asked, Jennifer stated she knew the CSW had come because of what Jennifer disclosed to her maternal aunt (MA). Jennifer told the CSW, "I would like to stop the case," saying she did not want to discuss "the incident" and did not want to get anyone in trouble. The CSW "validated" Jennifer's statement but also "provided words of encouragement in addition to education regarding the cycle of abuse, noting that if no one speaks up about the abuse, the abuse will likely continue with possible additional victims." Jennifer then told the CSW that Mother and Father met five years ago, when Jennifer was 11 years old. She continued that, "around 2021 or 2022, when she was 14 years old, she and a male friend her age, were hanging out in the room," and Father "came home to find her and her friend in the room." Father asked the friend to leave and, after he did, told Jennifer, "'Do as I say and I won't tell your mom." Father "then began touching her over and under her clothes." Jennifer said, "He touched my breast and front private (vagina) under the clothes with his hand." No one else was home at the time of the incident as Mother was working, and nothing else happened.

3

Jennifer reported a second incident occurred in November 2024, before Thanksgiving.  Mother had taken her phone away and given it to Father to store.  At the time, Father paid half of her phone bill.  When Mother was not home, Father asked Jennifer to go downstairs to his apartment, and she did.[2]  After she arrived, Father told her:  "Your phone is here, but stay here with me for a little while."  Jennifer said, "He then started kissing my neck and started touching me under my clothes on my breast and vagina.  He started kissing me on my mouth.  I closed my mouth and he kept trying to kiss my mouth.  I pushed him away, I came upstairs, showered, and started crying."  Jennifer recounted that the incident occurred in the bedroom of Father's biological children, "while his two younger children 'the girl and the 4 year old were sleeping on the bed.' "  Jennifer said Father was "[g]rabbing me and pulling me towards the bed (where his children were sleeping) and I was trying to push him away."

Toward the end of 2024, Jennifer said she came home from school, and Father came upstairs to her apartment (Mother was working).  Father asked if he could "get a hug" and "used that to start taking advantage."  Jennifer told him she did not want "this" (referring to the sexual abuse) to "keep happening" and she did not care about the consequences.  Father responded he would "give her time to think about it" and left.  He returned soon after, and Jennifer repeated herself.  Father said, "fine" and returned her phone.

---

[2] Jennifer and Mother lived in the same apartment complex as Father, with their apartment upstairs from his.  Jennifer explained that, in her apartment, she shared a room with Mother and Isaac, and Father's adult son Rudy occupied the second bedroom.

Jennifer explained she did not tell Mother about any of this because she was scared what Mother would think of her. After Mother had received the CSW's phone call, she had asked Jennifer if everything was okay. Jennifer told her that, ever since Mother took her phone away, Father had been "manoceandome" (fondling me). Mother seemed sad and scared. Jennifer said she felt safe with Mother and MA but was afraid of Father. Law enforcement then arrived to speak with Jennifer.[3]

### 2. Mother

Before the police officers interviewed Jennifer, they informed the CSW they had already spoken with Mother, who

---

[3] DCFS later obtained the police report from this interview. Jennifer had disclosed two incidents to the officers. The first incident "occurred on an unknown date in 2022" when Mother was not home. Father saw Jennifer had a male friend over and told him to leave. After the friend left, Father told Jennifer, "If you don't do what [I] tell you I will tell your mom about your friend." Father then told Jennifer to sit on the bed, after which he "placed his hand under her shirt touching her breasts. The victim stated the suspect then pulled down her pants and began to fondle her vaginal area with his hand for approximately 20–25 minutes. The victim stated there was no penetration." The second incident occurred in November 2024 after Mother had given Jennifer's cellphone to Father. Father told Jennifer if she wanted her phone back, she needed to go to his apartment. After she did, Father took Jennifer to his room and "began to take the victim[']s clothes off. The suspect then started to touch the victim's breast and fondle her vaginal area with his hands for approximately 20 minutes. After the 20 minutes, the suspect gave the victim her cellphone back. . . . The victim stated there was no penetration in this incident either."

5

denied Jennifer was ever alone with Father, or that Father had a key to their apartment.

When asked about Jennifer's allegations, Mother said Father "doesn't really come here" so she did not know when the incidents happened, and she did not believe Jennifer's statements. Mother said she thought Jennifer was lying because she did not like living in the apartment. Mother said she would continue her romantic relationship with Father, opining that "he is a good person and good to the kids." Mother had been laid off from work a few months ago, and Father had been "providing for her and the family." Mother agreed to temporarily move to a relative's house and prevent contact between Father and the children.

### 3.    Maternal Aunt

The CSW spoke with MA, who reported that "for some time," Jennifer had been sad, withdrawn, and without appetite, and had said she hated Father. On January 2, 2025, Jennifer disclosed the sexual abuse to MA, saying that the first incident occurred in 2021, and that Father had threatened her over disclosing the abuse to anyone. MA claimed Father isolated Mother from the maternal family.

### 4.    Father

Another CSW, investigating a "companion referral" regarding Father's biological children (Isaac's half siblings), asked Father about the allegations regarding Jennifer. Father

denied the allegations and accused Jennifer of falsely reporting an uncle had sexually abused her "a few years back."[4]

### 5.  Wendy

Ten days later, a CSW spoke with Mother's cousin Wendy, who described herself as a "distant aunt" to Jennifer. Wendy lived in Los Angeles until 2022 and remembered Jennifer to be a "friendly person." However, when Wendy visited during the holidays, she "observed a drastic change in Jennifer's demeanor. She noted the minor appeared withdrawn/depressed and her eyes looked sad, leading her to believe that that minor Jennifer was not doing well." Based on her own past experiences, Wendy grew concerned that Jennifer was being sexually abused. After Wendy disclosed her prior experience as a victim of sexual abuse to Jennifer and asked if anyone was hurting her, Jennifer began crying and saying she was scared. Eventually, Jennifer reported that on one occasion, Mother took her cellphone away and gave it to Father to store. Father told Jennifer he would return her phone "in exchange for him touching her." When Wendy asked if Father had abused her "completely, sexually," Jennifer "affirmed, verbalizing that 'in the past he had.' " Wendy clarified Jennifer never used the word "penetration," but that was what Wendy understood.

On January 30, 2025, the court issued an order removing Isaac from Father. DCFS released him to Mother.

---

[4] Mother later confirmed the maternal family no longer had contact with this uncle after Jennifer's allegations.

## B.   *DCFS Files a Petition*

In early February 2025, DCFS filed a petition on behalf of Jennifer under Welfare and Institutions Code section 300, subdivisions (b)(1) and (d), and on behalf of Isaac under subdivisions (b)(1) and (j).[5]  Counts b-1, d-1, and j-1 all identically alleged Father sexually abused Jennifer on three occasions: once in 2021 or 2022, once in November 2024 (while two of Father's biological children were in the room), and once in December 2024. The petition also alleged that Father had threatened Jennifer not to tell anyone of his abuse, and that Mother did not believe Jennifer when informed of the abuse and failed to protect her. DCFS claimed these acts endangered both children.

In mid-February 2025, Jennifer underwent a forensic interview.  A CSW in attendance summarized that Jennifer reported two incidents of Father "touching her on her breast area over clothes.  During one of the incidents[,] he also touched her buttocks area.  She reported that during one of the incidents, he put his hand under her shirt and rubbed her back with his hand. She reported one of the incidents took place while in his bedroom where his two young children were sleeping."  Jennifer also said Father threatened her both with telling Mother that she had a male friend in the home and with withholding her cellphone. Jennifer stated Mother sometimes asked Father to deliver food to her home when she was working and Jennifer was home alone.

At the mid-February 2025 initial hearing, the court found a prima facie case for detaining Isaac from Father.  Isaac remained released to Mother.

---

[5] Undesignated statutory references are to the Welfare and Institutions Code.

## C. *DCFS Continues to Investigate*

A dependency investigator (DI) spoke with several people about the case.

### 1. Jennifer

After a DI read the petition's allegations to her, Jennifer stated it was untrue that Mother had not believed her, saying Mother was just in shock when Jennifer told her. Jennifer also said she wanted to clarify that Father "was trying to push under my clothes, but I stopped him. . . . He started touching me over my clothes because I had put a stop to more." Jennifer denied Father had ever taken off her clothes. Jennifer also said Father had tried to kiss her and touch her buttocks, but she had backed up and prevented him from doing so. While Father did touch her breast, he did not touch her vagina, "just close like my thighs." She also confirmed that the "November [incident] was in his apartment" and "the kids were sleeping."

### 2. Mother

Mother explained it was not that she did not believe Jennifer, she was just surprised because Jennifer had never said anything before. Mother added she used to be out of the home for work from around 10:00 a.m. to 5:00 or 5:30 p.m. and had never observed anything concerning about Father's interactions with Jennifer.

### 3. Father

In late March 2025, a different DI investigating another case involving Father spoke with him about the allegations in this case. After being read the petition, Father told this DI: " 'Nunca pasa. Todo es mentira.' (This never happened.

9

Everything is a lie.)" When asked his opinion on why Jennifer made these accusations, he stated his belief that Jennifer was influenced by unnamed maternal uncles who did not approve of his relationship with Mother—Father claimed these maternal uncles had previously "engaged in physical and emotional altercations against" Mother. Father asserted he had never lived with Mother, Jennifer, and Isaac, and was now not even in a relationship with Mother because of the DCFS investigation. Father said he had never been alone with Jennifer and had only "brief contact" with her once or twice weekly.

Father spoke with the DI from this case in early April 2025. Father again denied all allegations of sexual abuse. When asked about his relationship with Jennifer, he stated, "There was no relationship. I knew her, say hi but I did not ask her anything like how her days was, etc. No relationship like a father and daughter. No hugs, just say hi." He admitted they each had the other's phone number but claimed they "did not talk or anything." Father "denied ever bringing Jennifer food or ha[ving] her eat at his apartment."

### 4. Maternal Aunt

MA stated Jennifer had reported that Father had told Jennifer she could trust him, and that it was okay if she had a boyfriend—Father would be on her side as he knew Mother was "really strict." Jennifer claimed Father was the one who told her to invite a male friend over, only to later tell her he would inform Mother about the friend unless Jennifer complied with his requests. MA opined Mother blamed her (MA) for the open DCFS case. MA also disclosed an incident the previous year where she and others were concerned about Jennifer and went to the family

10

home to speak with her, but Father "said it was his house" and claimed they had no right to be there.

MA told the DI of text messages Father sent Jennifer, calling her "love" and "mami," which MA said she had. MA provided the DI with screenshots showing someone addressed by Father's middle name[6] texting with someone addressed as "Jenny" or "Jeni." Father called Jennifer "[h]ermosa" (beautiful), "mami" (mommy), "amor" (love), "preciosa" (precious or beautiful), "bebé" (baby), and "darling." He also called her "mija" (a contraction of "mi hija" or "my daughter") and told her "medeves mi abraso dela navidad [*sic*]" (you owe me my hug from Christmas). He once texted her "ven acomer [*sic*]" (come eat). Father also told Jennifer he was at "la soto" (presumably a store) and asked if she wanted anything. After he sent her some views of landscapes, and she commented that the view was "bonita" (pretty), he responded "Están. Bonitos [*sic*] los lugares pero tu estas más hermosa" (the places are pretty but you are even more beautiful).

### 5.    Wendy

The DI spoke with Wendy, who reiterated the statements she made to the CSW during the initial investigation. She added that it was Father who told Mother to take Jennifer's phone away, claiming she was misbehaving.

### 6.    Father's Children

In May 2025, in response to a question from law enforcement, a DI stated that one of Father's sons Brandon C.

---

[6] Mother had previously stated she would refer to Father by his middle name.

(born Aug. 2008) denied Father ever abused him and asserted the allegations against Father were false. Another adult daughter also claimed the allegations were false.

### D. *The Court Removes Isaac From Father*

At the August 2025 adjudication hearing, Father's counsel called both Jennifer and Mother as witnesses. Jennifer testified she was not afraid of Father, and that Father had never threatened her. Mother testified that, when she and Father lived in the same apartment complex, neither had a key to the other's apartment.

DCFS's counsel argued the court should sustain the petition as to both Jennifer and Isaac, citing the evidence that Father had sexually abused Jennifer multiple times, once when his biological children were sleeping in the same room. Counsel also contended Father was a member of Jennifer's household, pointing out that he frequented the homes where Jennifer lived, was in a romantic relationship and shared a child with Mother, and financially supported the family.

Jennifer's counsel also asked the court to sustain the petition, citing other evidence about Father's abuse of Jennifer and pointing out that he was frequently found in Jennifer's home. Counsel also asserted the text messages Father exchanged with Jennifer contradicted his claim that he never communicated with her. Counsel characterized the text messages as "classic grooming behavior."

Isaac's counsel also asked the court to sustain the petition, arguing the evidence showed Father sexually abused Jennifer, which placed Isaac at risk even though he was Father's biological child and of a different gender than Jennifer.

Mother's counsel asked the court to sustain the petition against Father but strike the allegations against her, arguing the evidence demonstrated she neither knew nor should have known about the abuse.

Father's counsel asked the court to dismiss all the allegations against him, arguing both that the abuse never happened and that, even if it did, Isaac was differently situated and was not at risk from Father. Counsel pointed out the inconsistencies in some of Jennifer's statements and Father's inability to enter Jennifer's apartment unless someone there let him in. He also argued Father was not a member of Jennifer's household.

The court struck from the petition a sentence that Father took Jennifer's clothes off and tried to push her on to a bed, as well as a sentence that Father threatened Jennifer over telling anyone about the abuse. The court additionally added "over her clothing" to the allegations that Father fondled Jennifer. As amended, the court sustained the petition. The court found Jennifer's statements consistent and credible, and concluded the abuse she described did occur. The court also found that Father had continual and frequent contact with Jennifer's household and sent Jennifer inappropriate text messages. The court expressly found Isaac to be at risk, citing evidence that two of Father's young, biological children were sleeping in a room when one of the incidents of abuse occurred.

Turning to disposition, the court indicated its intention to remove Isaac from Father and release him to Mother. Counsel for Jennifer, Isaac, and Mother each agreed with the court's intention. Father's counsel objected, again arguing Isaac was differently situated. The court removed Isaac from Father and

13

released him to Mother, granting Father monitored visits with Isaac and ordering Father to have no contact with Jennifer.

Father timely appealed.

## DISCUSSION

In his opening brief, Father contends "there was insufficient evidence to sustain jurisdiction as to Isaac as there was no current risk of serious physical harm or sexual abuse by father based on the sustained allegations." However, he also argues "the jurisdictional findings that he sexually abused Jennifer M. should be reversed for insufficient evidence that the alleged abuse placed his son Isaac at risk of sexual abuse of serious physical harm as defined under section 300, subdivisions (b) and (d)." And in his reply brief, he states that he "challenges the juvenile court's findings that he sexually abused the daughter of Isaac's mother, the minor Jennifer."

Because it is unclear whether Father argues only that substantial evidence does not support finding that his sexual abuse of Jennifer placed Isaac at substantial risk of harm, or if he is also arguing that substantial evidence does not support a finding that he sexually abused Jennifer, we address both issues.

### A. *The Appeal Is Justiciable*

Father contends the juvenile court erred when it "sustained jurisdiction under section 300, subdivisions (b) and (d) as to Isaac." DCFS contends that "[b]ecause the assumption of jurisdiction under section 300, subdivision (j), is unchallenged and will remain despite father's argument as to the remaining counts, his appeal should be dismissed as non-justiciable."

Initially, we note Father's assertion is factually incorrect— DCFS filed a petition on behalf of Isaac under section 300,

14

subdivisions (b)(1) and (j), not (d). Therefore, the court sustained the petition as to Isaac under subdivisions (b)(1) and (j), not (d).

In any case, section 300, subdivision (j) provides for jurisdiction if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." Thus, while Father does not explicitly state he is challenging the court's finding of jurisdiction over Isaac under subdivision (j), he implicitly does so by arguing that there is no risk Isaac will be abused or neglected as defined in subdivisions (b)(1) and (d). We reach the merits of his appeal.

## B. *Substantial Evidence Supports the Court's Finding That Father Sexually Abused Jennifer*

We review jurisdictional findings for substantial evidence. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161–1162.) "In a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences. Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court. Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450–451.)

Here, Jennifer's statements to the CSW, to the DI, to the forensic examiner, as well as the statements she reportedly made to MA and to Wendy, all support the trial court's findings. As

15

Father himself admits, "[t]he court found the statements of Jennifer M. to be credible, which was sufficient evidence to find the allegations to be true."

## C.  *Substantial Evidence Supports the Court's Findings That Father's Abuse Endangered Isaac*

Father contends the court erred in assuming jurisdiction over Isaac because Father's "alleged sexual abuse of an unrelated teenage minor was not dispositive that his son Isaac (age 4) was at substantial risk of similar harm."

In *In re I.J.* (2013) 56 Cal.4th 766, our Supreme Court considered the question of "whether a father's sexual abuse of his *daughter* supports a determination that his *sons* are juvenile court dependents when there is no evidence the father sexually abused or otherwise mistreated the boys, and they were unaware of their sister's abuse before this proceeding began." (*Id.* at p. 770.) Our high court concluded that "a father's prolonged and egregious sexual abuse of his own child may provide substantial evidence to support a finding that all his children are juvenile court dependents," including his sons, even "when there is no evidence the father sexually abused or otherwise mistreated the boys," the boys "had not witnessed any of the sexual abuse and were unaware of it before this proceeding began," and "[t]he boys said they felt safe in the home and liked living with their parents." (*Id.* at pp. 770–771.)

In affirming the juvenile court's jurisdictional findings, our Supreme Court also considered "the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse." (*In re I.J.*, *supra*, 56 Cal.4th at p. 778.) The court stated that "[s]exual or other serious physical abuse of

16

a child by an adult constitutes a fundamental betrayal of the appropriate relationship between the generations. . . . When a parent abuses his or her own child, . . . the parent also abandons and contravenes the parental role." (*Ibid.*) Our high court concluded that "[t]he serious and prolonged nature of father's sexual abuse of his daughter under these circumstances supports the juvenile court's finding that the risk of abuse was substantial as to all the children." (*Ibid.*)

The Court of Appeal in *In re Andy G.* (2010) 183 Cal.App.4th 1405 rejected arguments similar to those Father makes now. In *Andy G.*, the court removed two-year-old Andy from his biological father after finding the father had sexually abused Andy's 12- and 14-year-old half sisters (who were not the father's children). (*Id.* at p. 1407.) On appeal, the father argued "that the evidence showing he sexually abused Andy's half sisters was not sufficient to show that Andy was at substantial risk of sexual abuse, since there was no evidence 'of suspicious contact between [Andy's father] and his son Andy or between [Andy's father] and any juvenile or adult male.' " (*Id.* at p. 1411.) The appellate court disagreed, finding that " 'aberrant sexual behavior by a parent places the victim's siblings who remain in the home at risk of aberrant sexual behavior.' " (*Id.* at p. 1414, quoting *In re P.A.* (2006) 144 Cal.App.4th 1339, 1347 [affirming juvenile court order removing two sons from father who sexually abused his daughter].) The court also found significant that the father exposed himself to Andy's half sister "while Andy was in the same room (albeit apparently facing in the other direction)" and "the court could infer, as the Department suggests, that [father] used Andy to get [half sister] Janet to approach him so he could expose himself to her, by asking her to take Andy to the

store and holding out the money to do so.  This evinces, at best, a total lack of concern for whether Andy might observe his aberrant sexual behavior." (*Andy G.*, at p. 1414; see also *In re D.C.* (2015) 243 Cal.App.4th 41, 54 [" 'Also relevant to the totality of the circumstances surrounding the sibling abuse is the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse' "], quoting *In re I.J.*, *supra,* 56 Cal.4th at p. 778.)

Here, while Jennifer was not Father's biological child, ample evidence in the record supports a conclusion that he acted at least partially in a parental role.[7]  He and Jennifer's mother were in a romantic relationship and shared a child who lived with Jennifer.  He brought food for Jennifer when Mother was working late.  He directed Mother to confiscate Jennifer's phone when she was allegedly "misbehaving" and was both the person who kept the phone and the person who ostensibly decided when to return it.  And he financially provided for the family when Mother was out of work.

Moreover, Father lied to DCFS about the extent of his relationship with Jennifer—claiming he barely spoke with her, when he had texted her several times, calling her "hermosa,"

---

[7] Thus, Father's citation to *In re B.T.* (2011) 193 Cal.App.4th 685 is inapposite.  First, regardless of the holding of *B.T.*, *In re I.J.*, issued by our Supreme Court two years later, supersedes any contrary holding in *B.T.*  Regardless, *B.T.* concerned a mother who had a sexual relationship with a willing 15-year-old boy who lived next door, where there was no evidence the mother treated the boy like a son. (*Id.* at p. 688.)  Here, Father was sexually abusing a teenaged girl with whom he acted at least partially in a parental role.

18

"preciosa," "amor," and "mija" among other terms of endearment. He also steadfastly refused to admit his abuse of her. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) And one of the incidents of sexual abuse occurred in the presence of two of Father's biological children who were sleeping in the same room and could have woken up to see the abuse.

Father argues that his biological children denied any sexual abuse and thus "there is no evidence that he ever behaved in a sexually aberrant manner with his children." But, in *I.J.*, there was also no evidence that the father had behaved in a sexually aberrant manner with his children. A court may find jurisdiction over a minor even if the offending parent has done nothing inappropriate to that child. (*In re D.G.* (2012) 208 Cal.App.4th 1562, 1573 [where father was found to have sexually molested D.G., who was not his biological daughter, finding of jurisdiction over L.C. was affirmed, though L.C. was his biological daughter, and "he did nothing inappropriate to L.C."].) Furthermore, while the denials of his biological children may have constituted evidence supporting a conclusion that Isaac was not at substantial risk, " ' " '[w]hen two or more inferences can reasonably be deduced from the facts,' either deduction will be supported by substantial evidence, and a 'reviewing court is without power to substitute its deductions for those of the trial court.' " ' " (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

On this record, we conclude substantial evidence supports the court's finding that Isaac was at substantial risk of harm, and thus the court did not err in assuming jurisdiction over him. Because Father's only argument that the court's dispositional order removing Isaac was erroneous is that "the jurisdictional

19

findings should be reversed for insufficient evidence," his challenge to the dispositional order fails as well.

## DISPOSITION

The court's orders are affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

BENDIX, Acting P. J.

WEINGART, J.

20